FEDERAL COMMUNICATIONS COMMISSION *v.*
MIDWEST VIDEO CORPORATION ET AL.

No. 77–1575.  Argued January 10, 1979—Decided April 2, 1979*

---

*Together with No. 77–1648, *American Civil Liberties Union* v. *Federal Communications Commission et al.*, and No. 77–1662, *National Black Media Coalition et al.* v. *Midwest Video Corporation et al.*, also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 709.

*Deputy Solicitor General Wallace* argued the cause for petitioner in No. 77–1575 and in support of petitioners in Nos. 77–1648 and 77–1662 under this Court's Rule 21 (4). With him on the briefs were *Solicitor General McCree, Richard A. Allen, David J. Saylor, Keith H. Fagan,* and *Julian R. Rush, Jr. Burt Neuborne, Bruce J. Ennis, Michael Botein,* and *David M. Rice* filed a brief for petitioner in No. 77–1648. *Edward J. Kuhlmann, Jeffrey H. Olson,* and *Charles M. Firestone* filed a brief for petitioners in No. 77–1662.

*George H. Shapiro* argued the cause for respondent Midwest Video Corp. in all cases. With him on the brief was *Harry M. Plotkin.*†

Mr. Justice White delivered the opinion of the Court.

In May 1976, the Federal Communications Commission promulgated rules requiring cable television systems that have 3,500 or more subscribers and carry broadcast signals to develop, at a minimum, a 20-channel capacity by 1986, to make available certain channels for access by third parties, and to furnish equipment and facilities for access purposes. *Report and Order in Docket No. 20508,* 59 F. C. C. 2d 294 (*1976 Order*). The issue here is whether these rules are "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting," *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 178 (1968), and hence within the Commission's statutory authority.

I

The regulations now under review had their genesis in rules prescribed by the Commission in 1972 requiring all cable operators in the top 100 television markets to design their systems to include at least 20 channels and to dedicate 4 of those channels for public, governmental, educational, and leased access. The rules were reassessed in the course of further rulemaking proceedings. As a result, the Commission modified a compliance deadline, *Report and Order in Docket No. 20363,* 54 F. C. C. 2d 207 (1975), effected certain substantive changes, and extended the rules to all cable systems having 3,500 or more subscribers, *1976 Order, supra.* In its

---

†*James Bouras, Fritz E. Attaway, Arthur Scheiner,* and *Stuart F. Feldstein* filed a brief for the Motion Picture Assn. of America as *amicus curiae* urging reversal.

*Lee Loevinger* and *Jay E. Ricks* filed a brief for Teleprompter Corp. et al. as *amici curiae* urging affirmance.

*1976 Order,* the Commission reaffirmed its view that there was "a definite societal good" in preserving access channels, though it acknowledged that the "overall impact that use of these channels can have may have been exaggerated in the past." 59 F. C. C. 2d, at 296.

As ultimately adopted, the rules prescribe a series of interrelated obligations ensuring public access to cable systems of a designated size and regulate the manner in which access is to be afforded and the charges that may be levied for providing it. Under the rules, cable systems must possess a minimum capacity of 20 channels as well as the technical capability for accomplishing two-way, nonvoice communication.[1] 47 CFR § 76.252 (1977). Moreover, to the extent of their available activated channel capacity,[2] cable systems must allocate four

---

[1] Systems in the top 100 markets and in operation prior to March 31, 1972, and other systems in operation by March 31, 1977, are given until June 21, 1986, to comply with the channel capacity and two-way communication requirements. 47 CFR § 76.252 (b) (1977).

[2] Activated channel capacity consists of the number of usable channels that the system actually provides to the subscriber's home or that it could provide by making certain modifications to its facilities. *1976 Order,* 59 F. C. C. 2d, at 315. The great majority of systems constructed in the major markets from 1962 to 1972 were designed with a 12-channel capacity. Often, additional channels may be activated by installing converters on subscribers' home sets, albeit at substantial cost. See *Notice of Proposed Rule Making,* 53 F. C. C. 2d 782, 785 (1975).

In determining the number of activated channels available for access use, channels already programmed by the cable operator for which a separate charge is made are excluded. Similarly, channels utilized for transmission of television broadcast signals are subtracted. The remaining channels deemed available for access use include channels provided to the subscriber but not programmed and channels carrying other nonbroadcast programming—such as programming originated by the system operator—for which a separate assessment is not made. *1976 Order, supra,* at 315–316. The Commission has indicated that it will "not consider as acting in good faith an operator with a system of limited activated channel capability who attempts to displace existing access uses with his own origination efforts." *Id.,* at 316. Additionally, the Commission has stated that pay

separate channels for use by public, educational, local governmental, and leased-access users, with one channel assigned to each. § 76.254 (a). Absent demand for full-time use of each access channel, the combined demand can be accommodated with fewer than four channels but with at least one. §§ 76.254 (b), (c).[3] When demand on a particular access channel exceeds a specified limit, the cable system must provide another access channel for the same purpose, to the extent of the system's activated capacity. § 76.254 (d). The rules also require cable systems to make equipment available for those utilizing public-access channels. § 76.256 (a).

Under the rules, cable operators are deprived of all discretion regarding who may exploit their access channels and what may be transmitted over such channels. System operators are specifically enjoined from exercising any control over the content of access programming except that they must adopt rules proscribing the transmission on most access channels of lottery information and commercial matter.[4] §§ 76.256

---

entertainment programming should not be "provided at the expense of local access efforts which are displaced. Should a system operator for example have only one complete channel available to provide access services we shall consider it as clear evidence of bad faith in complying with his access obligations if such operator decides to use that channel to provide pay programming." *Id.*, at 317.

[3] Cable systems in operation on June 21, 1976, that lack sufficient activated channel capacity to furnish one full channel for access purposes may meet their access obligations by providing whatever portions of channels that are available for such purposes. 47 CFR § 76.254 (c) (1977). Systems initiated after that date, and existing systems desirous of adding a nonmandatory broadcast signal after that date, must supply one full channel for access use even if they must install converters to do so. See *1976 Order, supra*, at 314–315.

[4] Cable systems were also required to promulgate rules prohibiting the transmission of obscene and indecent material on access channels. 47 CFR § 76.256 (d) (1977). The Court of Appeals for the District of Columbia Circuit stayed this aspect of the rules in an order filed in *American Civil Liberties Union* v. *FCC*, No. 76–1695 (Aug. 26, 1977). The court below, moreover, disapproved the requirement in the belief that

(b), (d). The regulations also instruct cable operators to issue rules providing for first-come, nondiscriminatory access on public and leased channels. §§ 76.256 (d)(1), (3).

Finally, the rules circumscribe what operators may charge for privileges of access and use of facilities and equipment. No charge may be assessed for the use of one public-access channel. § 76.256 (c)(2). Operators may not charge for the use of educational and governmental access for the first five years the system services such users. § 76.256 (c)(1). Leased-access-channel users must be charged an "appropriate" fee. § 76.256 (d)(3). Moreover, the rules admonish that charges for equipment, personnel, and production exacted from access users "shall be reasonable and consistent with the goal of affording users a low-cost means of television access." § 76.256 (c)(3). And "[n]o charges shall be made for live public access programs not exceeding five minutes in length." *Ibid.* Lastly, a system may not charge access users for utilization of its playback equipment or the personnel required to operate such equipment when the cable's production equipment is not deployed and when tapes or film can be played without technical alteration to the system's equipment. *Petition for Reconsideration in Docket No. 20508,* 62 F. C. C. 2d 399, 407 (1976).

The Commission's capacity and access rules were challenged on jurisdictional grounds in the course of the rulemaking proceedings. In its *1976 Order,* the Commission rejected such comments on the ground that the regulations furthered objectives that it might properly pursue in its supervision over broadcasting. Specifically, the Commission maintained that its rules would promote "the achievement of long-standing communications regulatory objectives by increasing outlets for

it imposed censorship obligations on cable operators. The Commission has instituted a review of the requirement, and it is not now in controversy before this Court.

local self-expression and augmenting the public's choice of programs." 59 F. C. C. 2d, at 298. The Commission did not find persuasive the contention that "the access requirements are in effect common carrier obligations which are beyond our authority to impose." *Id.,* at 299. The explanation was:

> "So long as the rules adopted are reasonably related to achieving objectives for which the Commission has been assigned jurisdiction we do not think they can be held beyond our authority merely by denominating them as somehow 'common carrier' in nature. The proper question, we believe, is not whether they fall in one category or another of regulation—whether they are more akin to obligations imposed on common carriers or obligations imposed on broadcasters to operate in the public interest— but whether the rules adopted promote statutory objectives." *Ibid.*

Additionally, the Commission denied that the rules violated the First Amendment, reasoning that when broadcasting or related activity by cable systems is involved First Amendment values are served by measures facilitating an exchange of ideas.

On petition for review, the Eighth Circuit set aside the Commission's access, channel capacity, and facilities rules as beyond the agency's jurisdiction. 571 F. 2d 1025 (1978). The court was of the view that the regulations were not reasonably ancillary to the Commission's jurisdiction over broadcasting, a jurisdictional condition established by past decisions of this Court. The rules amounted to an attempt to impose common-carrier obligations on cable operators, the court said, and thus ran counter to the statutory command that broadcasters themselves may not be treated as common carriers. See Communications Act of 1934, § 3 (h), 47 U. S. C. § 153 (h). Furthermore, the court made plain its belief that the regulations presented grave First Amend-

ment problems. We granted certiorari, 439 U. S. 816 (1978), and we now affirm.[5]

## II

### A

The Commission derives its regulatory authority from the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U. S. C. § 151 *et seq.* The Act preceded the advent of cable television and understandably does not expressly provide for the regulation of that medium. But it is clear that Congress meant to confer "broad authority" on the Commission, H. R. Rep. No. 1850, 73d Cong., 2d Sess., 1 (1934), so as "to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission." *FCC* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, 138 (1940). To that end, Congress subjected to regulation "all interstate and foreign communication by wire or radio." Communications Act of 1934, § 2 (a), 47 U. S. C. § 152 (a). In *United States* v. *Southwestern Cable Co.,* we construed § 2 (a) as conferring on the Commission a circumscribed range of power to regulate cable television, and we reaffirmed that determination in *United States* v. *Midwest Video Corp.,* 406 U. S. 649 (1972). The question now before us is whether the Act, as construed in these two cases, authorizes the capacity and access regulations that are here under challenge.

The *Southwestern* litigation arose out of the Commission's efforts to ameliorate the competitive impact on local broadcasting operations resulting from importation of distant signals by cable systems into the service areas of local stations.

---

[5] In the court below, the American Civil Liberties Union (ACLU), petitioner in No. 77–1648, challenged the Commission's modification of its 1972 access rules, which were less favorable to cable operators than are the regulations finally embraced. The ACLU requests that we remand these cases for further consideration of its challenge in the event that we reverse the judgment of the Eighth Circuit. As we affirm the judgment below, we necessarily decline the ACLU's invitation to remand.

Fearing that such importation might "destroy or seriously degrade the service offered by a television broadcaster," *First Report and Order,* 38 F. C. C. 683, 700 (1965), the Commission promulgated rules requiring CATV systems [6] to carry the signals of broadcast stations into whose service area they brought competing signals, to avoid duplication of local station programming on the same day such programming was broadcast, and to refrain from bringing new distant signals into the 100 largest television markets unless first demonstrating that the service would comport with the public interest. See *Second Report and Order,* 2 F. C. C. 2d 725 (1966). [7]

The Commission's assertion of jurisdiction was based on its view that "the successful performance" of its duty to ensure "the orderly development of an appropriate system of local television broadcasting" depended upon regulation of cable operations. 392 U. S., at 177. Against the background of the administrative undertaking at issue, the Court construed § 2 (a) of the Act as granting the Commission jurisdiction over cable television "reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting." 392 U. S., at 178.

Soon after our decision in *Southwestern,* the Commission

---

[6] CATV, or "community antenna television," refers to systems that receive television broadcast signals, amplify them, transmit them by cable or microwave, and distribute them by wire to subscribers. *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, 161 (1968). "Because of the broader functions to be served by such facilities in the future," the Commission adopted the "more inclusive term cable television systems" in *Cable Television Report and Order in Docket No. 18397,* 36 F. C. C. 2d 143, 144 n. 9 (1972).

[7] The validity of the particular regulations issued by the Commission was not at issue in *Southwestern.* See 392 U. S., at 167. In dicta in *United States* v. *Midwest Video Corp.,* 406 U. S. 649 (1972), the plurality noted that *Southwestern* had properly been applied by the courts of appeals to sustain the validity of the rules. *Id.,* at 659 n. 17.

resolved "to condition the carriage of television broadcast signals . . . upon a requirement that the CATV system also operate to a significant extent as a local outlet by originating." *Notice of Proposed Rulemaking and Notice of Inquiry,* 15 F. C. C. 2d 417, 422 (1968). It stated that its "concern with CATV carriage of broadcast signals [was] not just a matter of avoidance of adverse effects, but extend[ed] also to requiring CATV affirmatively to further statutory policies." *Ibid.* Accordingly, the Commission promulgated a rule providing that CATV systems having 3,500 or more subscribers may not carry the signal of any television broadcast station unless the system also operates to a significant extent as a local outlet by originating its own programs—or cablecasting—and maintains facilities for local production and presentation of programs other than automated services. 47 CFR § 74.1111 (a) (1970). This Court, by a 5-to-4 vote but without an opinion for the Court, sustained the Commission's jurisdiction to issue these regulations in *United States* v. *Midwest Video Corp., supra.*

Four Justices, in an opinion by MR. JUSTICE BRENNAN, reaffirmed the view that the Commission has jurisdiction over cable television and that such authority is delimited by its statutory responsibilities over television broadcasting. They thought that the reasonably-ancillary standard announced in *Southwestern* permitted regulation of CATV "with a view not merely to protect but to promote the objectives for which the Commission had been assigned jurisdiction over broadcasting." 406 U. S., at 667. The Commission had reasonably determined, MR. JUSTICE BRENNAN's opinion declared, that the origination requirement would " 'further the achievement of long-established regulatory goals in the field of television broadcasting by increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services. . . .' " *Id.,* at 667–668, quoting *First Report and Order,* 20 F. C. C. 2d 201, 202 (1969).

The conclusion was that the "program-origination rule [was] within the Commission's authority recognized in *Southwestern.*" 406 U. S., at 670.

THE CHIEF JUSTICE, in a separate opinion concurring in the result, admonished that the Commission's origination rule "strain[ed] the outer limits" of its jurisdiction. *Id.,* at 676. Though not "fully persuaded that the Commission ha[d] made the correct decision in [the] case," he was inclined to defer to its judgment. *Ibid.*[8]

## B

Because its access and capacity rules promote the long-established regulatory goals of maximization of outlets for local expression and diversification of programming—the objectives promoted by the rule sustained in *Midwest Video*—the Commission maintains that it plainly had jurisdiction to promulgate them. Respondents, in opposition, view the access regulations as an intrusion on cable system operations that is qualitatively different from the impact of the rule upheld in *Midwest Video.* Specifically, it is urged that by requiring the allocation of access channels to categories of users specified by

---

[8] The Commission repealed its mandatory origination rule in December 1974. It explained:

"Quality, effective, local programming demands creativity and interest. These factors cannot be mandated by law or contract. The net effect of attempting to require origination has been the expenditure of large amounts of money for programming that was, in many instances, neither wanted by subscribers nor beneficial to the system's total operation. In those cases in which the operator showed an interest or the cable community showed a desire for local programming, an outlet for local expression began to develop, regardless of specific legal requirements. During the suspension of the mandatory rule, cable operators have used business judgment and discretion in their origination decisions. For example, some operators have felt compelled to originate programming to attract and retain subscribers. These decisions have been made in light of local circumstances. This, we think, is as it should be." *Report and Order in Docket No. 19988,* 49 F. C. C. 2d 1090, 1105–1106.

the regulations and by depriving the cable operator of the power to select individual users or to control the programming on such channels, the regulations wrest a considerable degree of editorial control from the cable operator and in effect compel the cable system to provide a kind of common-carrier service. Respondents contend, therefore, that the regulations are not only qualitatively different from those heretofore approved by the courts but also contravene statutory limitations designed to safeguard the journalistic freedom of broadcasters, particularly the command of § 3 (h) of the Act that "a person engaged in . . . broadcasting shall not . . . be deemed a common carrier." 47 U. S. C. § 153 (h).

We agree with respondents that recognition of agency jurisdiction to promulgate the access rules would require an extension of this Court's prior decisions. Our holding in *Midwest Video* sustained the Commission's authority to regulate cable television with a purpose affirmatively to promote goals pursued in the regulation of television broadcasting; and the plurality's analysis of the origination requirement stressed the requirement's nexus to such goals. But the origination rule did not abrogate the cable operators' control over the composition of their programming, as do the access rules. It compelled operators only to assume a more positive role in that regard, one comparable to that fulfilled by television broadcasters. Cable operators had become enmeshed in the field of television broadcasting, and, by requiring them to engage in the functional equivalent of broadcasting, the Commission had sought "only to ensure that [they] satisfactorily [met] community needs within the context of their undertaking." 406 U. S., at 670 (opinion of BRENNAN, J.).

With its access rules, however, the Commission has transferred control of the content of access cable channels from cable operators to members of the public who wish to communicate by the cable medium. Effectively, the Commission has relegated cable systems, *pro tanto*, to common-carrier

status.[9]   A common-carrier service in the communications context[10] is one that "makes a public offering to provide [communications facilities] whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing . . . ." *Report and Order, Industrial Radiolocation Service, Docket No. 16106*, 5 F. C. C. 2d 197, 202 (1966); see *National Association of Regulatory Utility Comm'rs* v. *FCC*, 173 U. S. App. D. C. 413, 424, 525 F. 2d 630, 641, cert. denied, 425 U. S. 992 (1976); *Multipoint Distribution Service*, 45 F. C. C. 2d 616, 618 (1974). A common carrier does not "make individualized decisions, in particular cases, whether and on what terms to deal." *National Association of Regulatory Utility Comm'rs* v. *FCC, supra*, at 424, 525 F. 2d, at 641.

The access rules plainly impose common-carrier obligations on cable operators.[11]   Under the rules, cable systems are required to hold out dedicated channels on a first-come,

---

[9] A cable system may operate as a common carrier with respect to a portion of its service only. See *National Association of Regulatory Utility Comm'rs* v. *FCC*, 174 U. S. App. D. C. 374, 381, 533 F. 2d 601, 608 (1976) (opinion of Wilkey, J.) ("Since it is clearly possible for a given entity to carry on many types of activities, it is at least logical to conclude that one can be a common carrier with regard to some activities but not others"); *First Report and Order in Docket No. 18397*, 20 F. C. C. 2d 201, 207 (1969).

[10] Section 3 (h) defines "common carrier" as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy . . . ." Due to the circularity of the definition, resort must be had to court and agency pronouncements to ascertain the term's meaning. See *National Association of Regulatory Utility Comm'rs* v. *FCC*, 173 U. S. App. D. C. 413, 423, 525 F. 2d 630, 640, cert. denied, 425 U. S. 992 (1976); *Frontier Broadcasting Co.* v. *Collier*, 24 F. C. C. 251, 254 (1958); H. R. Conf. Rep. No. 1918, 73d Cong., 2d Sess., 46 (1934).

[11] As we have noted, and as the Commission has held, cable systems otherwise "are not common carriers within the meaning of the Act." *United States* v. *Southwestern Cable Co.*, 392 U. S., at 169 n. 29; see *Frontier Broadcasting Co.* v. *Collier, supra*.

nondiscriminatory basis. 47 CFR §§ 76.254 (a), 76.256 (d) (1977).[12]   Operators are prohibited from determining or influencing the content of access programming. § 76.256 (b). And the rules delimit what operators may charge for access and use of equipment. § 76.256 (c). Indeed, in its early consideration of access obligations—whereby "CATV operators [would] furnish studio facilities and technical assistance [but] have no control over program content except as may be required by the Commission's rules and applicable law"—the Commission acknowledged that the result would be the operation of cable systems "as common carriers on some channels." *First Report and Order in Docket No. 18397,* 20 F. C. C. 2d, at 207; see *id.,* at 202; *Cable Television Report and Order,* 36 F. C. C. 2d 143, 197 (1972). In its *1976 Order,* the Commission did not directly deny that its access requirements compelled common carriage, and it has conceded before this Court that the rules "can be viewed as a limited form of common carriage-type obligation." Brief for Petitioner in No. 77–1575, p. 39. But the Commission continues to insist that this characterization of the obligation imposed by the rules is immaterial to the question of its power to issue them; its authority to promulgate the rules is assured, in the Commission's view, so long as the rules promote statutory objectives.

Congress, however, did not regard the character of regulatory obligations as irrelevant to the determination of whether they might permissibly be imposed in the context of broadcasting itself. The Commission is directed explicitly by § 3 (h) of the Act not to treat persons engaged in broadcasting as common carriers. We considered the genealogy and the meaning of this provision in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94 (1973).

---

[12] See also *1976 Order,* 59 F. C. C. 2d, at 316 ("We expect the operator in general to administer all access channels on a first come, first served non-discriminatory basis").

The issue in that case was whether a broadcast licensee's general policy of not selling advertising time to individuals or groups wishing to speak on issues important to them violated the Communications Act of 1934 or the First Amendment. Our examination of the legislative history of the Radio Act of 1927—the precursor to the Communications Act of 1934— prompted us to conclude that "in the area of discussion of public issues Congress chose to leave broad journalistic discretion with the licensee." 412 U. S., at 105. We determined, in fact, that "Congress specifically dealt with—and firmly rejected—the argument that the broadcast facilities should be open on a nonselective basis to all persons wishing to talk about public issues." *Ibid.* The Court took note of a bill reported to the Senate by the Committee on Interstate Commerce providing in part that any licensee who permits " 'a broadcasting station to be used . . . for the discussion of any question affecting the public . . . shall make no discrimination as to the use of such broadcasting station, and with respect to said matters the licensee shall be deemed a common carrier in interstate commerce: Provided, that such licensee shall have no power to censor the material broadcast.' " *Id.*, at 106, quoting 67 Cong. Rec. 12503 (1926). That bill was amended to eliminate the common-carrier obligation because of the perceived lack of wisdom in " 'put[ting] the broadcaster under the hampering control of being a common carrier' " and because of problems in administering a nondiscriminatory right of access. 412 U. S., at 106; see 67 Cong. Rec. 12502, 12504 (1926).

The Court further observed that, in enacting the 1934 Act, Congress rejected still another proposal "that would have imposed a limited obligation on broadcasters to turn over their microphones to persons wishing to speak out on certain public issues." 412 U. S., at 107–108.[13] "Instead," the Court noted,

---

[13] The proposal adopted by the Senate provided:

"[I]f any licensee shall permit any person to use a broadcasting station

"Congress after prolonged consideration adopted § 3 (h), which specifically provides that 'a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.' " *Id.*, at 108–109.

"Congress' flat refusal to impose a 'common carrier' right of access for all persons wishing to speak out on public issues," *id.*, at 110, was perceived as consistent with other provisions of the 1934 Act evincing "a legislative desire to preserve values of private journalism." *Id.*, at 109. Notable among them was § 326 of the Act, which enjoins the Commission from exercising " 'the power of censorship over the radio communications or signals transmitted by any radio station,' " and commands that " 'no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.' " 412 U. S., at 110, quoting 47 U. S. C. § 326.

The holding of the Court in *Columbia Broadcasting* was in accord with the view of the Commission that the Act itself did not require a licensee to accept paid editorial advertisements. Accordingly, we did not decide the question whether the Act, though not mandating the claimed access, would nevertheless permit the Commission to require broadcasters to extend a range of public access by regulations similar to those at issue here. The Court speculated that the Commission might have flexibility to regulate access, 412 U. S., at 122, and that

in support of or in opposition to any candidate for public office, or in the presentation of views on a public question to be voted upon at an election, he shall afford equal opportunity to an equal number of other persons to use such station in support of an opposing candidate for such public office, or to reply to a person who has used such broadcasting station in support of or in opposition to a candidate, or for the presentation of opposite views on such public questions."

See Hearings on S. 2910 before the Senate Committee on Interstate Commerce, 73d Cong., 2d Sess., 19 (1934). The portion regarding discussion of public issues was excised by the House-Senate Conference. See H. R. Conf. Rep. No. 1918, 73d Cong., 2d Sess., 49 (1934).

"[c]onceivably at some future date Congress or the Commission—or the broadcasters—may devise some kind of limited right of access that is both practicable and desirable," *id.*, at 131. But this is insufficient support for the Commission's position in the present case. The language of § 3 (h) is unequivocal; it stipulates that broadcasters shall not be treated as common carriers. As we see it, § 3 (h), consistently with the policy of the Act to preserve editorial control of programming in the licensee, forecloses any discretion in the Commission to impose access requirements amounting to common-carrier obligations on broadcast systems.[14] The provision's background manifests a congressional belief that the intrusion worked by such regulation on the journalistic integrity of broadcasters would overshadow any benefits associated with the resulting public access. It is difficult to deny, then, that forcing broadcasters to develop a "nondiscriminatory system for controlling access . . . is precisely what Congress intended to avoid through § 3 (h) of the Act." 412 U. S., at 140 n. 9 (STEWART, J., concurring); see *id.*, at 152, and n. 2 (Douglas, J., concurring in judgment).[15]

---

[14] Whether less intrusive access regulation might fall within the Commission's jurisdiction, or survive constitutional challenge even if within the Commission's power, is not presently before this Court. Certainly, our construction of § 3 (h) does not put into question the statutory authority for the fairness-doctrine obligations sustained in *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969). The fairness doctrine does not require that a broadcaster provide common carriage; it contemplates a wide range of licensee discretion. See *Report on Editorializing by Broadcast Licensees*, 13 F. C. C. 1246, 1251 (1949) (in meeting fairness-doctrine obligations the "licensee will in each instance be called upon to exercise his best judgment and good sense in determining what subjects should be considered, the particular format of the programs to be devoted to each subject, the different shades of opinion to be presented, and the spokesmen for each point of view").

[15] The dissent maintains that § 3 (h) does not place "limits on the Commission's exercise of powers otherwise within its statutory authority because a lawfully imposed requirement might be termed a 'common car-

Of course, § 3 (h) does not explicitly limit the regulation of cable systems. But without reference to the provisions of the Act directly governing broadcasting, the Commission's jurisdiction under § 2 (a) would be unbounded. See *United States v. Midwest Video Corp.*, 406 U. S., at 661 (opinion of BRENNAN, J.). Though afforded wide latitude in its supervision over communication by wire, the Commission was not delegated unrestrained authority. The Court regarded the Commission's regulatory effort at issue in *Southwestern* as consistent with the Act because it had been found necessary to ensure the achievement of the Commission's statutory responsibilities.[16] Specifically, regulation was imperative to prevent

---

rier obligation.' " *Post*, at 710–711. Rather, § 3 (h) means only that "every broadcast station is not to be *deemed* a common carrier, and therefore subject to common-carrier regulation under Title II of the Act, simply because it is engaged in radio broadcasting." *Post*, at 710. But Congress was plainly anxious to avoid regulation of broadcasters as common carriers under Title II, which commands, *inter alia*, that regulated entities shall "furnish . . . communication service upon reasonable request therefor." 47 U. S. C. § 201 (a). Our review of the Act in *Columbia Broadcasting* led us to conclude that § 3 (h) embodies a substantive determination not to abrogate a broadcaster's journalistic independence for the purpose of, and as a result of, furnishing members of the public with media access:

"Congress pointedly refrained from divesting broadcasters of their control over the selection of voices; § 3 (h) of the Act stands as a firm congressional statement that broadcast licensees are not to be treated as common carriers, obliged to accept whatever is tendered by members of the public. [The] provisio[n] clearly manifest[s] the intention of Congress to maintain a substantial measure of journalistic independence for the broadcast licensee." 412 U. S., at 116.

We now reaffirm that view of § 3 (h): The purpose of the provision and its mandatory wording preclude Commission discretion to compel broadcasters to act as common carriers, even with respect to a portion of their total services. As we demonstrate in the following text, that same constraint applies to the regulation of cable television systems.

[16] The Commission contends that the signal carriage rules involved in *Southwestern* are, in part, analogous to the Commission's access rules in question here. The signal carriage rules required, *inter alia*, that cable

interference with the Commission's work in the broadcasting area. And in *Midwest Video* the Commission had endeavored to promote long-established goals of broadcasting regulation. Petitioners do not deny that statutory objectives pertinent to broadcasting bear on what the Commission might require cable systems to do. Indeed, they argue that the Commission's authority to promulgate the access rules derives from the relationship of those rules to the objectives discussed in *Midwest Video*. But they overlook the fact that Congress has restricted the Commission's ability to advance objectives associated with public access at the expense of the journalistic freedom of persons engaged in broadcasting.

That limitation is not one having peculiar applicability to television broadcasting. Its force is not diminished by the variant technology involved in cable transmissions. Cable operators now share with broadcasters a significant amount of editorial discretion regarding what their programming will include. As the Commission, itself, has observed, "both in their signal carriage decisions and in connection with their origination function, cable television systems are afforded considerable control over the content of the programming they provide." *Report and Order in Docket No. 20829*, 69 F. C. C. 2d 1324, 1333 (1978).[17]

---

operators transmit, upon request, the broadcast signals of broadcast licensees into whose service area the cable operator imported competing signals. See *First Report and Order in Docket No. 14895*, 38 F. C. C. 683, 716–719 (1965). But that requirement did not amount to a duty to hold out facilities indifferently for public use and thus did not compel cable operators to function as common carriers. See *supra*, at 701. Rather, the rule was limited to remedying a specific perceived evil and thus involved a balance of considerations not addressed by § 3 (h).

[17] We do not suggest, nor do we find it necessary to conclude, that the discretion exercised by cable operators is of the same magnitude as that enjoyed by broadcasters. Moreover, we reject the contention that the Commission's access rules will not significantly compromise the editorial discretion actually exercised by cable operators. At least in certain instances the access obligations will restrict expansion of other cable services. See

In determining, then, whether the Commission's assertion of jurisdiction is "reasonably ancillary to the effective performance of [its] various responsibilities for the regulation of television broadcasting," *United States* v. *Southwestern Cable Co.,* 392 U. S., at 178, we are unable to ignore Congress' stern disapproval—evidenced in § 3 (h)—of negation of the editorial discretion otherwise enjoyed by broadcasters and cable operators alike. Though the lack of congressional guidance has in the past led us to defer—albeit cautiously—to the Commission's judgment regarding the scope of its authority, here there are strong indications that agency flexibility was to be sharply delimited.

The exercise of jurisdiction in *Midwest Video,* it has been said, "strain[ed] the outer limits" of Commission authority. 406 U. S., at 676 (BURGER, C. J., concurring in result). In light of the hesitancy with which Congress approached the access issue in the broadcast area, and in view of its outright rejection of a broad right of public access on a common-carrier basis, we are constrained to hold that the Commission exceeded those limits in promulgating its access rules.[18] The

nn. 2, 3, *supra.* And even when not occasioning the displacement of alternative programming, compelling cable operators indiscriminately to accept access programming will interfere with their determinations regarding the total service offering to be extended to subscribers.

[18] The Commission has argued that the capacity, access, and facilities regulations should not be reviewed as a unit, but as discrete rules entailing unique considerations. But the Commission concedes that the facilities and access rules are integrally related, see Brief for Petitioner in No. 77-1575, p. 36 n. 32, and acknowledges that the capacity rules were adopted in part to complement the access requirement, see *id.,* at 35; *1976 Order,* 59 F. C. C. 2d, at 313, 322. At the very least it is unclear whether any particular rule or portion thereof would have been promulgated in isolation. Accordingly, we affirm the lower court's determination to set aside the amalgam of rules without intimating any view regarding whether a particular element thereof might appropriately be revitalized in a different context.

Commission may not regulate cable systems as common carriers, just as it may not impose such obligations on television broadcasters. We think authority to compel cable operators to provide common carriage of public-originated transmissions must come specifically from Congress.[19]

*Affirmed.*

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

In 1969, the Commission adopted a rule requiring cable television systems to originate a significant number of local programs. In *United States* v. *Midwest Video Corp.,* 406 U. S. 649, the Court upheld the Commission's authority to promulgate this "mandatory origination" rule. Thereafter, the Commission decided that less onerous rules would accomplish its purpose of "increasing the number of outlets for community self-expression and augmenting the public's choice of programs and types of services."[1] Accordingly, it adopted the access rules that the Court invalidates today.[2]

---

[19] The court below suggested that the Commission's rules might violate the First Amendment rights of cable operators. Because our decision rests on statutory grounds, we express no view on that question, save to acknowledge that it is not frivolous and to make clear that the asserted constitutional issue did not determine or sharply influence our construction of the statute. The Court of Appeals intimated, additionally, that the rules might effect an unconstitutional "taking" of property or, by exposing a cable operator to possible criminal prosecution for offensive cablecasting by access users over which the operator has no control, might affront the Due Process Clause of the Fifth Amendment. We forgo comment on these issues as well.

[1] The quotation is from the report accompanying the promulgation of the 1969 rules. See *First Report and Order,* 20 F. C. C. 2d 201, 202 (1969) (*1969 Order*). The report accompanying the 1976 rules identifies precisely the same purpose. See *Report and Order in Docket 20508,* 59 F. C. C. 2d 294, 298 (1976) (App. 103).

[2] By the time of this Court's decision in *Midwest Video,* the Commission had adopted limited-access and channel-capacity rules. See *Cable*

In my opinion the Court's holding in *Midwest Video* that the mandatory origination rules were within the Commission's statutory authority requires a like holding with respect to the less burdensome access rules at issue here. The Court's contrary conclusion is based on its reading of § 3 (h) of the Act as denying the Commission the power to impose common-carrier obligations on broadcasters. I am persuaded that the Court has misread the statute.

Section 3 (h) provides:

> " 'Common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier." 47 U. S. C. § 153 (h).

Section 3 is the definitional section of the Act. It does not purport to grant or deny the Commission any substantive authority. Section 3 (h) makes it clear that every broadcast station is not to be *deemed* a common carrier, and therefore subject to common-carrier regulation under Title II of the Act, simply because it is engaged in radio broadcasting. But nothing in the words of the statute or its legislative history suggests that § 3 (h) places limits on the Commission's exercise of powers otherwise within its statutory authority because

*Television Report and Order in Docket No. 18397,* 36 F. C. C. 2d 143 (1972); *American Civil Liberties Union* v. *FCC,* 523 F. 2d 1344 (CA9 1975). In 1974, the Commission largely repealed the mandatory origination rule at issue in *Midwest Video* on the grounds that access was found to be a less burdensome and equally effective means of furthering the same statutory objectives. See *Report and Order in Docket No. 19988,* 49 F. C. C. 2d 1090, 1099–1100, 1104–1106 (1974). The 1972 access rules were reviewed and amended in 1976, see *Report and Order in Docket No. 20508, supra,* and it is these rules that are at issue here.

a lawfully imposed requirement might be termed a "common carrier obligation." [3]

The Commission's understanding supports this reading of § 3 (h). In past decisions interpreting FCC authority under the Communications Act, "we [have been] guided by the 'venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.'" *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 121, quoting *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381. The Commission's construction of § 3 (h) is clear: it has never interpreted that provision, or any other in the Communications Act, as a limitation on its authority to impose common-carrier obligations on cable systems.

---

[3] The Senate Report on the Communications Act of 1934, for example, simply stated:

"Section 3: Contains the definitions. Most of these are taken from the Radio Act, the Interstate Commerce Act, and international conventions." S. Rep. No. 781, 73d Cong., 2d Sess., 3 (1934).

The House Report was only slightly more detailed; as to § 3 (h), it explained:

"Since a person must be a common carrier for hire to come within this definition, it does not include press associations or other organizations engaged in the business of collecting and distributing news services, which may refuse to furnish to any person service which they are capable of furnishing, and may furnish service under varying arrangements, establishing the service to be rendered, the terms under which rendered, and the charges therefor." H. R. Rep. No. 1850, 73d Cong., 2d Sess., 4 (1934).

Finally, the Conference Report "noted that the definition does not include any person if not a common carrier in the ordinary sense of the term." H. R. Conf. Rep. No. 1918, 73d Cong., 2d Sess., 46 (1934).

Section 3 (h), it seems clear to me, cannot be read to be directly applicable to cable systems in any regard. Such systems are not, in the full range of their activities, "common carrier[s] in the ordinary sense of the term." And, as relevant here, they are technically not broadcasters at all; what they are engaged in is the distinct process of "cablecasting." See *1969 Order, supra,* at 223.

The Commission's 1966 rules, which gave rise to this Court's decision in *United States v. Southwestern Cable Co.*, 392 U. S. 157, imposed just such an obligation. Under those rules, local systems were required to carry, upon request and in a specific order of priority, the signals of broadcast stations into whose viewing area they bring competing signals.[4] And its 1969 rules, according to the FCC Report and Order, reflected the Commission's view "that a multi-purpose CATV operation combining carriage of broadcast signals with program origination and common carrier services, might best exploit cable channel capacity to the advantage of the public and promote the basic purpose for which this Commission was created."[5] Finally, in adopting the rules at issue here, the Commission explicitly rejected the rationale the Court accepts today:

"So long as the rules adopted are reasonably related to achieving objectives for which the Commission has been assigned jurisdiction we do not think they can be held beyond our authority merely by denominating them as somehow 'common carrier' in nature. The proper ques-

---

[4] See *Second Report and Order in Docket 14895*, 2 F. C. C. 2d 725 (1966). The *Southwestern Cable* Court did not pass upon the validity of these rules. MR. JUSTICE BRENNAN's opinion for the plurality in *United States v. Midwest Video Corp.*, 406 U. S. 649, 659 n. 17, noted that "[t]heir validity was, however, subsequently and correctly upheld by courts of appeals as within the guidelines of that decision. See, e. g., *Black Hills Video Corp. v. FCC*, 399 F. 2d 65 (CA8 1968)."

[5] *1969 Order*, 20 F. C. C. 2d, at 202. See also *United States v. Midwest Video Corp., supra*, at 654 n. 8 (plurality opinion):

"Although the Commission did not impose common carrier obligations on CATV systems in its 1969 report, it did note that 'the origination requirement will help ensure that origination facilities are available for use by others originating on leased channels.' First Report and Order 209. Public access requirements were introduced in the Commission's Report and Order on Cable Television Service, although not directly under the heading of common-carrier service. See [Report and Order on Cable Television Service] 3277."

tion, we believe, is not whether they fall in one category or another of regulation—whether they are more akin to obligations imposed on common carriers or obligations imposed on broadcasters to operate in the public interest— but whether the rules adopted promote statutory objectives." 59 F. C. C. 2d 294, 299 (1976).

In my judgment, this is the correct approach. *Columbia Broadcasting System, Inc.* v. *Democratic National Committee, supra,* relied upon almost exclusively by the majority, is not to the contrary. In that case, we reviewed the provisions of the Communications Act, including § 3 (h), which had some bearing on the access question presented. We emphasized, as does the majority here, that "Congress has time and again rejected various legislative attempts that would have mandated a variety of forms of individual access." 412 U. S., at 122. But we went on to conclude: "That is not to say that Congress' rejection of such proposals must be taken to mean that Congress is opposed to private rights of access under all circumstances. *Rather, the point is that Congress has chosen to leave such questions with the Commission, to which it has given the flexibility to experiment with new ideas as changing conditions require." Ibid.* (emphasis added).[6]

The Commission here has exercised its "flexibility to experiment" in choosing to replace the mandatory origination rule upheld in *Midwest Video* with what it views as the less onerous local access rules at issue here. I have no reason to doubt its conclusion that these rules, like the mandatory origination rule they replace, do promote the statutory objectives of "increasing the number of outlets for community self-expres-

---

[6] While the Court in *Columbia Broadcasting System, Inc.* v. *Democratic National Committee* went on to reject the claim that the Commission's refusal to require broadcasters to accept paid political advertisements was unconstitutional, it also recognized that "[c]onceivably at some future date Congress or the Commission—or the broadcasters—may devise some kind of limited right of access that is both practicable and desirable" and noted the rules at issue here as an example. 412 U. S., at 131.

sion and augmenting the public's choice of programs and types of services." And under this Court's holding in *Midwest Video,* this is all that is required to uphold the jurisdiction of the Commission to promulgate these rules. Since Congress has not seen fit to modify the scope of the statute as construed in *Midwest Video,* I would therefore reverse the judgment of the Court of Appeals for the Eighth Circuit and remand the case with instructions to decide the constitutional issue.