**Florence BRIDGES, Plaintiff,**

v.

**PITTSBURGH COMMUNITY BROADCASTING CORPORATION, Board of Directors, David Albrecht, et al. Defendants.**

**Civ. A. No. 79–1347.**

United States District Court,
W. D. Pennsylvania.

June 27, 1980.

### FINDINGS AND OPINION

WEBER, Chief Judge.

In this pro se civil rights action, Plaintiff alleges violation of her First, Fifth and Fourteenth Amendment rights and of Title II of the 1964 Civil Rights Act, and seeks to enjoin the Defendants from denying her access to and use of the facilities at the Defendants' broadcasting station.

This case was originally heard by the late Judge Daniel J. Snyder, Jr., of this Court. Evidentiary hearings were held on November 28 and November 30, 1979 on Plaintiff's claim for preliminary injunctive relief. This was denied because of the absence of proof of irreparable harm. A final hearing

on the prayer for Permanent Injunction was held on February 22, 1980 and an opportunity to file briefs was granted. Before any findings or opinion was filed Judge Snyder died and the case was reassigned to this judge. A conference of the parties and counsel was called for June 19, 1980 at which Plaintiff was given the opportunity to request an entire new trial or to agree to having this judge determine the matter on the existing record. Because Plaintiff did not have a copy of the transcript of the former hearings she requested and was allowed time to read the transcript, and a trial date for a new trial was set for June 23, 1980. On that date, Plaintiff agreed that the matter be determined by the undersigned Judge on the existing record. Both parties requested leave to submit an additional exhibit. The Court then allowed Plaintiff and Defendant's counsel to make additional argument and then took the matter under advisement.

Pittsburgh Community Broadcasting Corporation (Corporation), a Pennsylvania, non-profit corporation, owns and operates WYEP, 91.5 FM (Station), a non-commercial educational FM broadcast station licensed by the FCC. Under the Articles of Incorporation, the Corporation's purpose is to establish and operate exclusively for educational purposes one or more non-commercial, educational broadcasting stations. The broadcasting facilities are manned by Corporation members, generally on a volunteer basis. Under corporate by-laws there are two types of members—subscribing members, those giving monetary gifts to the Corporation during the year, and working members, those contributing at least five hours of service per month. In a promotional circular the station claims to have approximately 2,000 financial supporters, a paid staff of nine, and a volunteer staff of over 100.

The Station bills itself as providing the metropolitan Pittsburgh area with "quality instructional programming as a means of stimulating general education", "news and public affairs presentations as a forum for opinion and the balanced discussion of issues, and a variety of music and drama as a source of cultural enrichment." Particularly as to its news and public affairs presentations, the Corporation claimed to provide "an accessible forum for all segments of the community to present and debate issues of local and national concern."

The Station's policy, as described in its monthly "Program Guide," was one of public access—programming created by local citizens to present local issues and culture, with the airwaves available 24 hours per day, seven days per week. The Guide further states "It is contrary to WYEP's access policy to refuse to accept requests or phone calls. WYEP must remain open to all suggestions all the time." The Station's policy was, in fact, to actively seek out opposing view points on any issue. Furthermore, in a promotional circular, the Station indicated its need for program gathering volunteers—producers of news and public affairs reports, producers of music specials, "citizen reporters" and researcher and air staff personnel—to maintain high quality service.

Florence Bridges joined the Station in August, 1974, as a volunteer worker. From 1974 through 1975 and again from 1976 through 1979, she produced shows and assisted others in producing shows, generally on community affairs. However, Bridges' relationship with the Station, specifically with the Board of Directors, was less than harmonious. In June and July 1978, Bridges filed petitions with the FCC requesting denial of the Corporation's license renewal application. The reasons for the request included alleged failures to follow the Corporate by-laws and to meet the goals of noncommercial educational radio broadcasting. But the main thrust of her petition was alleged racial discrimination in the treatment of black members, e. g., arbitrary enforcement of regulations, discouraging or refusing programming produced by blacks, etc. By letter dated October 5, 1978, the FCC dismissed Bridges' request stating that the charges were too broad and the statistics she provided rebutted her charges.

In March 1979, the United Black Station Members, and apparently Bridges is affiliated with this organization, filed a complaint with the Pennsylvania Human Relations Commission against the Corporation alleging sexual and racial harassment at the Station and a failure to meet black needs in programming. Proceedings before the Commission are still pending. During the hearings in this Court, Plaintiff referred to "her" hearing before the Commission. A prior separate action by the United Black Station Members was filed with the Commonwealth of Pennsylvania which resulted in the Corporation losing its non-profit tax exempt status for a period. Bridges denied she had anything to do with this petition.

In a letter dated August 20, 1979, the Board of Directors informed Bridges that her presence was "no longer desired or welcomed." In addition, she could not host, announce, direct or produce a program on or for the Station. She was instructed not to enter the Station's premises, as entry would be considered an act of trespass. Copies of the letter were furnished to a local magistrate and the Pittsburgh Police Department. A notice to the same effect was posted at the station requesting any staff member or volunteer who witnessed Bridges entering the station to contact one of the members of the Board of Directors.

Bridges promptly filed suit against the Corporation and the Directors individually in Allegheny County Common Pleas Court requesting injunctive relief from the "banning order issued by the Board of Directors." Plaintiff's complaint recited her history of service with the station, which she claimed, in effect, entitled her to a due process hearing before such banning order could issue. She further claimed that the order infringed on her First Amendment right to freedom of speech.

On October 10, 1979, Judge McGowan of the Common Pleas Court of Allegheny County, Pennsylvania, ordered the Defendants to provide Plaintiff a hearing with notice specifying charges against her, and with the right to be present, to confront and cross examine witnesses and to present evidence on her own behalf.

While the state court action was pending before Judge McGowan, Bridges filed the present federal action on September 20, 1979, styled "Injunctive Relief against Discrimination in Places of Public Accommodation." In the complaint, she alleged that the Board action deprived her of corporate privileges, trampled her right of freedom of speech, limited her freedom of mobility and generally violated her First, Fifth and Fourteenth Amendment rights, and her rights under Title II of the Civil Rights Act of 1964.

At the hearing, Bridges professed ignorance as to the reasons for the Board's actions. The details of the uneasy relationship between Bridges and the Corporation were brought out by John Zagaro, acting President of the Board of Directors. According to Zagaro, Bridges was unsatisfied with the management and operation of the Station, alleging racism and sexism. Attempts to resolve her complaints through discussion disintegrated into shouting matches. There were bitter confrontations between Bridges and other staff personnel, e. g., the Program Director, about programming decisions and enforcement of station regulations. (e. g., Bridges would smoke in the control room though warned not to; Bridges claimed others smoked there and no complaints were raised). Bridges apparently took her battles beyond the Board meetings, as Zagaro claimed she harassed members of the Board of Directors with early morning phone calls and discouraged other blacks from participating at the Station. William Askin, Program Director, added that Bridges refused to cooperate on the use of the facilities, disrupting other programming. The decision was also prompted by, in Zagaro's terms, Bridges' "unreasonable and duplicative" suits filed against the Corporation.

A pro se civil rights complaint demands judicious treatment by the Court, liberally construing the pleadings. But, however we might have construed Plaintiff's complaint on a motion to dismiss, at this stage of the proceeding there has been a full hearing

and argument and we cannot ignore Plaintiff's narrow assertions in this case. Despite Plaintiff's previous assertions that the Defendants had engaged in racial and sexual discrimination, Plaintiff insists these allegations are not presented in this case. Next, Plaintiff insists that this action is not concerned with her due process rights as a one-time member of the Corporation. Plaintiff's present claim is that of a member of the public to free speech and free access to a place of public accommodation without threat of criminal trespass action. We do not intimate that Plaintiff waived federal claims which could be adjudicated now; rather, the Court need not reach these issues here.

■ Bridges' First Amendment claims of right of access to radio air waves are effectively defeated by the Supreme Court's holding in *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed. 692 (1979), where the Court struck down FCC rules requiring cable systems to hold out certain channels on a first come non-discriminatory basis. " '[I]n the area of discussion of public issues Congress chose to leave broad journalistic discretion with the licensee.' " Congress rejected an attempt to impose even " 'a limited obligation on broadcasters to turn over their microphones to persons wishing to speak out on certain public issues.' " 440 U.S. at 703, 99 S.Ct. at 1443, 59 L.Ed.2d at 704, quoting *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Thus, access to broadcast media is not a matter of constitutional or statutory right. *See also McIntire v. Wm. Penn Broadcasting Co.*, 151 F.2d 597 (3d Cir. 1945). Furthermore, it is not clear that Bridges has been denied access to the airwaves. While the letter to Bridges from the Board of Directors states she may not host or produce a program for the station, Bridges stated she still produces programs (but does not host them) and at the final argument on June 23, 1980, it was brought out that she has continued to produce programs on the air.

■ Thus, we consider what right Bridges may have as a member of the public to enter the physical facility divorced from her right to host or produce a program. Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, prohibits discrimination in places of public accommodation on the basis of race, color, religion or national origin. Plaintiff continues to insist that she does not base this action on any claim of racial discrimination, but solely as a member of the public.

The Court does not find the Station's premises to be a public accommodation as that term is used in 42 U.S.C. § 2000a(b). While a witness for Bridges stated that entry can usually be gained through an unlocked fire exit, Bridges herself stated a key was necessary, although the key was usually accessible. Zagaro stated that whatever else public access radio might mean, it did not mean access to the facilities unless related to programming and we agree.

Even assuming some right of the public to walk through the facility, Defendant would have the right to exclude individuals reasonably classified as disruptive. See *Rosado Maysonet v. Solis*, 409 F.Supp. 576 (D.Puerto Rico 1975). Plaintiff eliminated from the case the issue of racial and sexual discrimination and failed to prove that the Defendant's action in excluding her was other than reasonable. Thus we cannot find that the exclusion was unlawful. Accordingly, the Defendant's threat to treat Plaintiff's entrance onto the property as a trespass fails to entitle Plaintiff to any relief. *Hurley v. Hinckley*, 304 F.Supp. 704 (D.Mass.1969), *aff'd per curiam sub nom Doyle v. O'Brien*, 396 U.S. 277, 90 S.Ct. 603, 24 L.Ed.2d 469 (1970). Our holding here should not be construed as affecting Bridges' right to the due process hearing ordered by Judge McGowan in the state court action based on a denial of membership rights, nor plaintiff's right to proceed with her racial or sex discrimination claims before the Human Relations Commission.

The foregoing shall constitute the Court's findings of Fact and Conclusions of Law.

An appropriate order will be entered denying Plaintiff's prayer for permanent injunction and dismissing the action.