KIRO, INCORPORATED, Licensee,
KIRO–TV, Seattle, Washington,
Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and the United States of
America, Respondents,

Vanhu, Inc., Intervenor.

KIRO, INCORPORATED, Licensee of
KIRO–TV, Seattle, Washington,
Petitioner,

v.

UNITED STATES of America and Feder-
al Communications Commission,
Respondents,

United Community Antenna Systems,
Inc., Intervenor.

In re KIRO, INC., Petitioner.

Nos. 75–1233, 75–1390 and 79–2333.

United States Court of Appeals,
District of Columbia Circuit.

July 7, 1980.

Leon T. Knauer, Washington, D. C., with whom Robert W. Barker and H. Michael Semler, Washington, D. C., were on brief, for petitioner.

---

**8.** The fixing of costs, if any, is handled routinely under 28 U.S.C. § 1920 (1976).

Julian R. Rush, Jr., counsel, F. C. C., Washington, D. C., with whom Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Acting Associate Gen. Counsel, F. C. C., Carl D. Lawson and Samuel R. Simon, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents. Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., for respondents.

Harry M. Plotkin, George H. Shapiro and Mary Candace Fowler, Washington, D. C., were on brief, for intervenor in No. 75–1390.

Richard L. Brown, Washington, D. C., entered an appearance for intervenor in No. 75–1233.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and WILLIAM WAYNE JUSTICE *, United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

These cases are here from the Federal Communications Commission ("FCC" or "Commission") after remand.[1] The petitioner, KIRO, Inc., is an affiliate of CBS television in Seattle, Washington. It seeks review of the FCC's refusal to grant it protection from competing Seattle cable systems that import and broadcast American network programming appearing on Canadian television prior to its telecast in the United States. Because the Commis-

sion's decision denying the requested relief is now adequately supported by the record supplemented on remand, we affirm.

## I.  BACKGROUND

Cable television ("CATV") systems pose a competitive threat to conventional over-the-air stations because their importation of distant signals may divert viewers who otherwise would watch local stations. This danger is particularly great where the imported signals merely duplicate the programming appearing on the local stations, as when a CATV system imports and duplicates the network programming of a local network affiliate.[2]

In an effort to ensure the financial integrity of local affiliates, the Commission over the years has limited the amount of duplicated network programming that cable systems may import. As early as 1963, this court upheld the Commission's refusal to license a cable system that would have merely duplicated the broadcasting of a local station.[3] In 1965, the Commission adopted general regulations to deal with this problem. The Commission established a protective zone of 15 days before and after an affiliate's broadcast of network programming during which there was to be a presumption that the affiliate would be seriously harmed if duplication were allowed. During this period the affiliate accordingly could request the cable systems to black out their duplicating network broadcasts.[4] In 1966 this right to affiliate "exclusivity" was reduced to the actual day of the network broadcast,[5] and in 1972 was further reduced to "simultaneous exclusivi-

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. Our initial opinion concerned appeal Nos. 75–1233 and 75–1390 and is reported at 545 F.2d 204 (D.C.Cir.1976). See pp. 902–903. Appeal No. 79–2333 is a petition for writ of mandamus filed subsequent to our remand and ordered by this court to be consolidated with the two cases presently under review. See note 18 infra.

2. See CBS Television Network Affiliates v. FCC, 555 F.2d 985 (D.C.Cir.1977).

3. Carter Mountain Transmission Corp. v. FCC, 321 F.2d 359 (D.C.Cir.), cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), aff'ng 32 F.C.C. 459 (1962).

4. First Report and Order in Dockets 14895 and 15233, 38 F.C.C. 683 (1965).

5. Second Report and Order in Dockets 14895, 15233, and 15971, 2 F.C.C.2d 725, 748–50 (1966).

ty"[6] because, in the Commission's view, "[s]imultaneous nonduplication [would] protect[ ] the bulk of the popular network programming of most network affiliates."[7]

In one area of the country, however, simultaneous exclusivity apparently is not an effective protection. American producers of network programming frequently make their programs available to Canadian television stations for broadcast prior to their initial showing by television stations in the United States. As a result, CATV systems in cities such as Seattle are able to import this "pre-released" network programming days, and sometimes weeks, before it is scheduled to be shown on the American over-the-air stations near the border.[8] Nevertheless, except for one brief period,[9] the Commission has not afforded network affiliates subject to the phenomenon of Canadian pre-release the same presumption of harm that is available in the case of simultaneous duplication. In its decision in *Colorcable, Inc.*,[10] the Commis-

sion held that it would grant protection to such stations only where they could make a particularized showing of harm resulting in an impairment of their "ability to provide a programming service in the public interest."[11] This remains the basic rule today.[12]

## II. THE PRESENT CASES

These cases first came to us when the Commission, applying *Colorcable*, rejected KIRO's request to block the pre-release of its network programming by two competing Seattle cable systems.[13] Upon consideration of KIRO's petition for review, we remanded the record because of four basic defects in the Commission's order denying relief.[14] First, we noted the apparent inconsistency between the Commission's liberal practice of granting protection against simultaneous cable duplication while denying protection against Canadian pre-release absent an individual showing of harm.[15]

---

6. Cable Television Report and Order, 36 F.C.C.2d 143, 181 (1972). *See also* Second Report and Order, 54 F.C.C.2d 229, 240–41 (1975) (eliminating mountain time zone exception to 1972 Report).

7. 36 F.C.C.2d at 337. *See* 47 C.F.R. § 76.92–99 (current regulations).

8. *See* Report and Order in Docket No. 20649, 75 F.C.C.2d 304 (1979).

9. Immediately following this court's remand. *See* note 18 *infra*.

10. 25 F.C.C.2d 195 (1970).

11. *Id.* at 197. The Commission stated that procedurally this requirement would be considered as a petition for special relief under 47 C.F.R. § 76.71, which provides:

    On petition by a . . . licensee of a television broadcast . . . station, . . . the Commission may waive any provision of the rules relating to cable television systems, impose additional or different requirements, or issue a ruling on a complaint or disputed question.

12. *See* note 19 *infra*.

13. *See* Vanhu, Inc., 47 F.C.C.2d 1244 (1974), *recon. denied*, 51 F.C.C.2d 211 (1974), and United Community Antenna Systems, Inc., 49 F.C.C.2d 873 (1974), *recon. denied*, 52 F.C.C.2d 389 (1975). In *Vanhu, Inc.*, KIRO urged the FCC to limit Vanhu's certificate for a new Seattle cable

system by requiring it to delete all American network programming appearing on its three imported Canadian stations "prior to, or on the same day, as such programming is carried by KIRO . . . at the regularly scheduled network time." *Id.* at 1245. In *United Community Antenna Systems, Inc.*, KIRO requested the same conditions to be imposed upon United Community's certificate to add one Canadian station to the two it already carried. *Id.* at 874. *See* 47 C.F.R. § 76.31 (certificate of compliance from FCC required before cable system may commence or alter operations).

14. *KIRO, Inc. v. FCC*, 545 F.2d 204 (D.C.Cir. 1976).

15. 545 F.2d at 208. To explain our concern, we quoted from the dissenting Commissioner in *Colorcable*:

    It seems to me that, in terms of both logic and equity, a cable system's carriage of a Canadian station's pre-released United States network programs, . . . is a more serious threat than another domestic station's simultaneous carriage of the same network service. Our rules clearly protect against the latter. We should also protect against the greater threat.

    *Id., quoting* 25 F.C.C.2d at 207 (Commissioner Cox, dissenting).

We also noted three procedural defects in the Commission's decision: a reliance upon improperly noticed facts;[16] an improper assumption that the Commission could not grant relief against some cable systems without granting relief against all;[17] and an inconsistency in the reasoning underlying the majority's conclusions.[18]

The Commission's proceedings on remand have been tortuous, consuming over three years and resulting in three separate dispositions of KIRO's complaint.[19] During this process, the Commission has again considered, and rejected, the possibility of treating pre-released programming in the same fashion as simultaneous duplication.[20]

16. In its decision the Commission had asserted that the networks could provide KIRO with relief by pressuring program distributors to cease making their programs available to Canadian stations on an advance basis. United Community Antenna Systems, Inc., 52 F.C.C.2d 389, 390 (1975) (on reconsideration). See United Community, supra, 49 F.C.C.2d at 877 (concurring statement of Chairman Wiley, joined by Commissioners Reid, Quello and Washburn). Neither the parties nor the Commission had introduced any evidence on this subject into the record. See KIRO, Inc. v. FCC, 545 F.2d 204, 209 (D.C.Cir.1976).

17. The Commission had denied KIRO relief, in part, because doing so would "competitively disadvantage" Vanhu and United Community relative to other systems in the area that were already airing the same network signals imported from Canada. Vanhu, supra, 47 F.C.C.2d at 1245; United Community, supra, 49 F.C.C.2d at 875. We pointed out that by this reasoning KIRO could never secure relief through adjudicatory proceedings because every cable system would be able to make the same argument of competitive disadvantage. We accordingly held that "KIRO should not be denied relief entirely because relief must be granted in increments." 545 F.2d at 209.

18. The Commission's decision referred to Colorcable, suggesting a continuing adherence to Colorcable's presumption that adverse impact is not to be anticipated from cable pre-release of Canadian signals. But a majority of the Commission also joined Chairman Wiley's concurrence stating that harm is to be anticipated, and that Canadian pre-release is "an essentially unfair practice [which] should be terminated in the near future." United Community, supra, 49 F.C.C.2d at 877 (Chairman Wiley, concurring). Because the actual basis for the Commission's decision could not be discerned, we could not affirm the orders on the basis of the record before us. See 545 F.2d at 208 (citing SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1940)).

19. On remand, the Commission initially ordered the cable systems to provide KIRO with relief, concluding that, as with simultaneous duplication, harm should be presumed in the case of pre-release. In re: Vanhu, Inc., 65 F.C.C.2d 986, 989–90 (1977). On petition for

reconsideration, however, the Commission stayed its order to give the cable systems an opportunity to rebut this presumption of harm by showing that KIRO would not, in fact, be significantly injured by their pre-released programming. In re: United Community Antenna Systems, Inc., 67 F.C.C.2d 1376 (1978). In response to this decision, KIRO filed its petition for writ of mandamus, which has been consolidated with KIRO's other two appeals now before this court. See In re: KIRO, Inc., No. 79–2333 (D.C.Cir., filed Nov. 8, 1979); In re: KIRO, Inc., No. 79–2333 (D.C.Cir., Nov. 28, 1979) (order of consolidation). In its petition KIRO argued that the Commission's decision to allow the cable parties to make a rebuttal showing violated both this court's remand decision and the Commission's practice in implementing the presumption of harm in the simultaneous duplication area. KIRO requested this court to order the Commission to provide the relief it had requested or to make a final decision within the next 30 days.

The Commission's third and final decision is presently before us for review. In re: United Community Antenna Systems, Inc., F.C.C. 79–781, 75 F.C.C.2d 448 (Released Nov. 30, 1979). There, reversing field once again, the Commission decided on the basis of the rulemaking proceeding described in note 20 infra that KIRO was not entitled to a presumption of harm, as had been held in its two preceding decisions. However, the Commission also ruled that whether or not KIRO was entitled to such a presumption, the record before it did not provide a basis for granting KIRO relief.

20. See Docket No. 20649, "Applicability of Section 325(b) of the Communications Act to Non-Interconnected Distribution of Television Programming to Certain Foreign Stations," announced at 40 Fed.Reg. 50309 (1975), final Report and Order published at 75 F.C.C.2d 304 (1979). In these proceedings, the Commission examined economic data furnished by American licensees, networks, cable systems, and program suppliers to determine whether to adopt general regulations limiting Canadian pre-release practices. The Commission decided, in light of this evidence, that Canadian pre-release is "not a substantial threat to the financial viability of U.S. television stations or to their ability to program in the public interest." 75 F.C.C.2d at 306 (emphasis supplied).

The Commission has also again denied KIRO relief.[21] Importantly for purposes of this appeal, the Commission now bases its denial of KIRO's petition upon two different grounds. As it did before, the Commission contends that KIRO has failed to make the particularized showing of harm required for protection from pre-released programming.[22] But the Commission also argues that even if KIRO were given the benefit of a presumption of harm "the evidence of insubstantial impact developed in the record here . . . would overcome such a general presumption in the instant case."[23] Thus, according to the Commission, because of the unique facts of this case it is of no moment whether KIRO's request is considered pursuant to the *Colorcable* approach or under the simultaneous duplication regulations. In either case, KIRO would not be entitled to relief.

## III. DISCUSSION

The parties do not dispute that the Commission's lengthy proceedings have cured the procedural defects identified by our earlier decision.[24] Instead, they focus entirely on whether the Commission was *required* by our decision and general principles of fair administrative procedure to review KIRO's petition as though it were a petition for relief from simultaneous duplication; that is, whether the Commission was required to grant KIRO a presumption of harm.[25] Due to the nature of the Commission's decision here, however, we need not reach this issue. We find sufficient support for the Commission's conclusion in this case that KIRO would not be entitled to relief even under the Commission's simultaneous regulations. We therefore affirm the Commission's denial of KIRO's individual petition for relief, and leave for another day the question of whether the Commission has provided a rational basis for distinguishing between simultaneously-released and pre-released broadcasting.

In reaching this conclusion, we first consider the Commission's regulations in the

It accordingly held that it would be contrary to the public interest, *id.* at 33, and beyond its ancillary jurisdiction over cable systems, *id.* at 33 (citing *FCC v. Midwest Video Corp.*, 440 U.S. 689, 697, 99 S.Ct. 1435, 1439, 59 L.Ed.2d 692 (1979)), to adopt general rules limiting cable systems from carrying Canadian pre-released programming or to impose restrictions on licensing or physical transfer of tapes across the border. The Commission did not, however, consider why harm should still be presumed in the case of simultaneous duplication, nor whether the competitive threat posed by simultaneous duplication differs in any significant way from that posed by pre-released programming. *See* note 15 *supra.*

**21.** *In re:* United Community Antenna Systems, Inc., F.C.C. 79–781, 75 F.C.C.2d 448 (Released Nov. 30, 1979) ["United Community"]. Although the Commission's decision by its literal terms applies only to United Community, the Commission has informed the court that the decision will be applied to Vanhu when that system becomes operational. *See* Response of Federal Communications Commission to the court's Order to Show Cause, April 28, 1980, at 2.

**22.** *Id.*, F.C.C. 79–781 (p. 12), 75 F.C.C.2d at 458.

**23.** *Id.*, F.C.C. 79–781 (p. 9 n.9), 75 F.C.C.2d at 455 n.9.

**24.** *See* pp. 902 903 *supra.*

**25.** KIRO contends that our remand required the Commission to treat pre-released and simultaneously-released network programming *identically* until comparative analysis by the Commission establishes that they pose different threats to the well-being of network affiliates. Petitioner's Memorandum on November 30, 1979 Opinion and December 12, 1979 Report of the Federal Communications Commission [Petitioner's Memo. of Feb. 14, 1980] at 4–5; Petitioner's Reply to Respondents' Responses [Petitioner's Reply Memo. of March 10, 1980] at 4.

The Commission and Intervenors argue that the Commission's conclusions in Docket 20649, *see* note 20 *supra*, provide a rational basis for treating these two forms of duplication differently. Memorandum of the Federal Communications Commission in Response to the Court's Order [FCC Memo. of Feb. 29, 1980] at 4; United Community Antenna Systems Response to Petitioner's Memorandum [Intervenor's Memo. of Feb. 29, 1980] at 5–6. The FCC and intervenor also contend the FCC's decision not to institute a comparative study in response to the court's remand was "a reasonable exercise of discretion" by the agency to husband its scarce resources and to deregulate the cable industry "one step at a time." FCC Memo. of Feb. 29, 1980, *supra*, at 7–8. *See* Intervenor's Memo. of Feb. 29, 1980, *supra*, at 9.

simultaneous duplication area, and then their application to the case at hand.

### A. Simultaneous Duplication Regulations

Under the Commission's simultaneous duplication regulations, qualifying television stations are entitled to protection unless a duplicating CATV system can qualify for a waiver.[26] Two recent decisions by the Commission describe the procedures for obtaining such waivers.[27] The CATV system's fundamental burden is to demonstrate with particularity why a waiver would serve the public interest.[28] One, but not the only,[29] method for discharging that burden is for the cable system to rebut the normal presumption of harm—that "without protection[,] serious financial problems, resulting in a loss of service, would befall local television stations."[30] The cable system's showing must include the effect of granting waiver to all present and likely cable competitors in the television station's relevant market area.[31] If on the basis of projected audience loss data, the nature of the market and the station seeking protection, and publicly available financial data about the station[32] it appears that the impact of granting these waivers would be insubstantial, the cable system will be held to have carried its burden.[33] It is then incumbent upon the television station to show specific harm to itself or the public interest, or else waiver will be granted.[34]

26. See, e. g., Cable TV of Santa Barbara, Inc. v. FCC, 428 F.2d 672 (9th Cir. 1970); Port Angeles Telecable, Inc. v. FCC, 416 F.2d 243 (9th Cir. 1969).

27. In re: Blythesville TV Cable Co., 68 F.C.C.2d 1065 (1978); In re: Texas Community Antennas, Inc., 68 F.C.C.2d 1271 (1978). See 47 C.F.R. § 76.92–.95 (providing simultaneous network exclusivity protection).

28. Texas Community Antennas, Inc., supra, 68 F.C.C.2d at 1279. This burden is described by the Commission as a "heavy burden," because the cable system, by challenging the application of a general rule, "poses [a threat] to the orderly conduct of Commission business." Id. The Commission has noted, however, that it too has an independent "obligation to seek out the 'public interest' in particular, individualized cases" and to give each waiver request a "hard look." Texas Community Antennas, Inc., supra, 68 F.C.C.2d at 1379, quoting WAIT Radio v. FCC, 418 F.2d 1153, 1157 (D.C.Cir.1969).

29. Because this is an era of rapid change in which the Commission is still acquiring experience and learning the consequences of various technological advances, the Commission has indicated that other methods will be available to CATV systems seeking waiver from the simultaneous duplication regulations. See Texas Community Antennas, Inc., supra, 68 F.C.C.2d at 1279.

30. Blythesville TV Cable Co., supra, 68 F.C.C.2d at 1067.

31. Id. at 1068.

32. Texas Community Antennas, Inc., supra, 68 F.C.C.2d at 1281. The Commission's decisions refer to "publicly available" information, because the Commission's current policy is to withhold licensees' Annual Financial Reports (FCC Form 324) from the public on confidentiality grounds. In the Commission's view, the correlation between viewer diversion and review impact is close enough that a cable system may discharge its burden of showing insubstantial impact by relying largely on audience data figures. Id.

33. The Commission has alternately described the result of such a showing as a "prima facie case" for relief and "the minimum showing necessary to warrant special relief." See Texas Community Antennas, Inc., supra, 68 F.C.C.2d at 1280–81. While the Commission apparently has never before found a sufficient rebuttal showing in administering its simultaneous exclusivity rules, see FCC Opposition to Petition for Writ of Mandamus [FCC Opposition to Writ of Nov. 16, 1979] at 3, it has recently held that a cable system met its burden in the related context of a petition for special relief from its distant signal importation restrictions. See Arlington Telecommunications Corp., 69 F.C.C.2d 1923 (1978), recon., 70 F.C.C.2d 2291 (1979), motion for stay denied sub nom. The Committee to Balance the Impact Gaff and to Make ARTEC Constitutional v. FCC, No. 79–1303, et al. (D.C.Cir. Oct. 31, 1979).

34. This is what we understand by the Commission's reference to the CATV system's showing as a "prima facie" case for relief, particularly in light of the Commission's decisions in related areas of cable regulation. See, e. g., Arlington Telecommunications Corp., 69 F.C.C.2d 1923, 1941 (1978) (distant signal importation regulations).

### B. *Application to KIRO and the Cable Systems*

The Commission's decision denying KIRO relief was consistent with these principles. To evaluate the cable systems' argument that KIRO would not suffer significant harm from pre-released network programming the Commission carefully examined evidence submitted by KIRO and the cable systems, as well as the calculations of its own staff. Contrary to KIRO's contention,[35] the Commission's decision to request information from KIRO was not, in our view, at odds with the Commission's general practice in the simultaneous duplication arena. Such protection is not "automatic," as KIRO alleges,[36] but depends upon a finding by the Commission that the normal presumption of harm applies.[37] This, as the Commission's practice makes clear, may require a close look at factual data of the sort requested by the Commission from KIRO.[38]

In evaluating this information the Commission applied two formulas that KIRO does not contest. First, the Commission calculated KIRO's audience diversion by estimating the maximum proportion of KIRO's prime time audience that might be lost to Canadian stations broadcasting to Seattle via cable. The Commission concluded that no more than 1.9 percent audience diversion was likely during prime time.[39] Next, the Commission converted these figures into anticipated loss of station revenue. Even assuming that 100 percent of KIRO's prime time programming was subject to Canadian pre-release (a generous assumption),[40] the Commission concluded that no more than 1.4 percent of KIRO's revenues would be lost.[41]

In arriving at these estimates of minimal impact, the Commission responded adequately to the objections of both KIRO and the cable systems. KIRO, for example, argued that the Commission's estimates for cable penetration into the Seattle market did not adequately account for anticipated growth in the number of household subscribers. The Commission responded by noting that both the history of the Seattle cable market and studies of the cable industry in general indicated that KIRO's growth projections were unwarranted.[42]

**35.** *See* note 19 *supra.*

**36.** Petition for Writ of Mandamus at 10.

**37.** *See e. g.,* Texas Community Antennas, *supra,* 68 F.C.C.2d at 1279.

**38.** As far as the record reveals, KIRO was only requested to furnish "updated information on the extent of its programming being duplicated by the Canadian stations." United Community Antenna Systems, Inc., FCC 79–781 (p. 3), 75 F.C.C.2d 448, 449 (1979). Such information is likely to be critical for assessing a cable system's argument that the normal presumption of harm is inapplicable. Moreover, unlike sensitive information on the financial condition of the station, it is clearly not confidential. *See* note 32 *supra.*

**39.** The Commission arrived at this estimate by using an "audience fractionalization formula" derived from its decisions in Docket No. 19995, 54 F.C.C.2d 29 (1975), and Texas Community Antennas, Inc., *supra,* 68 F.C.C.2d at 1280. This formula estimates audience diversion by finding the proportion of a station's average prime time audience taken by the product of (a) the number of cable households with access to the duplicated programming via cable; (b) the percentage of households watching television during prime time; and (c) the Canadian sta-

tions' share of the prime time cable audience. United Community Antenna Systems, Inc., FCC 79–781 (pp. 10–11 & appendix), 75 F.C. C.2d 448, 456–57 (1979). The Commission expressly noted its formula is likely to greatly *overestimate* audience diversion, because (1) it assumes that *all* of a station's prime-time broadcasting will be duplicated and (2) it assumes whatever diversion of viewers occurs will come entirely at the expense of the subject station. *Id.* FCC 79–781 (p. 11 n.12), 75 F.C. C.2d at 457 n.12.

**40.** According to the Commission "at most, only 50% of KIRO–TV's programming could be subject to pre-release duplication since Canadian stations are limited to a maximum 50% showing of U.S. programs during prime time." *Id.*

**41.** The Commission arrived at this estimate by multiplying KIRO's audience loss by 75%, the percentage of a typical station's revenue derived from its network programming. *United Community, supra,* FCC 79–781 (p. 11), 75 F.C. C.2d at 457.

**42.** *Id.* FCC 79–781 (p. 10), 75 F.C.C.2d at 456. KIRO argued that 50% cable penetration into the Seattle market could be expected, up from the current 15% penetration figure. The Com-

Similarly, the Commission rejected KIRO's proposed estimate of the Canadian station's share of the Seattle cable audience only after identifying obvious flaws in KIRO's proposal.[43] The Commission also carefully considered, and in most cases rejected, challenges by the cable systems to the validity of the evidence of duplication submitted by KIRO.[44]

On the basis of this analysis, the Commission concluded that allowing pre-released programming in Seattle would present no "demonstrable or plausible" threat to KIRO's ability to operate in the public interest.[45] We do not find this conclusion to conflict with the Commission's general practice in administering its simultaneous duplication rules. The 1.9% audience loss estimated for KIRO by the Commission would appear to be far less than that of stations which have successfully resisted cable waiver petitions in the past.[46] Similarly, KIRO's estimated 1.4% revenue loss is well within the range of revenue losses the Commission has found a station can experience with no adverse effect.[47] Moreover, the Commission's opinion expressly notes that KIRO participates in a television market that is currently thriving.[48] Because KIRO failed to overcome this evidence of insubstantial economic impact, the Commission concluded that protection would be unwarranted. We do not find this conclusion to be an abuse of discretion or a departure

from the fundamental requirement of reasoned decisionmaking, see *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C.Cir.1971), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *WAIT Radio v. FCC*, 418 F.2d 1153, 1156 (D.C.Cir.1969). We therefore dismiss KIRO's petitions for review.

## IV. CONCLUSION

Our affirmance of the Commission, however, should not be interpreted as approval of either the Commission's inordinant delay in ruling on KIRO's request or its failure to reconcile its pre-release and simultaneous duplication regulations. As matters now stand, an aggrieved television station still may invoke a presumption of harm when its programming is simultaneously released, but not when that same programming is released on an advance basis. The Commission has yet to explain why different levels of harm are to be expected in these two contexts despite their obvious similarities. We affirm the Commission on this record only because it has made a convincing case for denying KIRO protection *regardless of the applicability of a presumption of harm*. Kiro's petitions for judicial relief are accordingly dismissed.

*So ordered.*

---

mission pointed out, however, that more than three-fourths of the cable systems in the market had already matured so that significant increases in subscriber counts was unlikely.

**43.** KIRO suggested that the Canadian stations could be expected to capture KIRO's entire prime time cable audience—20% of the total audience at that time period. This, the Commission pointed out, was highly improbable because less than half of KIRO's prime time programming was even subject to pre-release. *Id.* FCC 79–781 (p. 10), 75 F.C.C.2d at 457.

**44.** The cable systems argued, for example, that KIRO had submitted data only for weeks when duplication was extraordinarily high. The Commission rejected this contention because the cable systems had provided evidence of only one other period when less duplication occurred. *Id.* FCC 79–781 (p. 9), 75 F.C.C.2d at 456.

**45.** *Id.* FCC 79–781 (p. 12), 75 F.C.C.2d at 458.

**46.** *See, e. g.*, Texas Community Antennas, Inc., *supra*, 68 F.C.C.2d at 1283 (13.9% expected audience loss too great to allow waiver).

**47.** *See* Report and Order in Docket 20649, 75 F.C.C.2d 304, 337–38 (1979).

**48.** Total revenues for the Seattle market stations have increased from $20,469,715 in 1972 to $46,312,306 in 1977, a 126 percent increase; total operating income has increased from $5,410,836 in 1973 to $20,120,300 in 1977, a 272 percent increase. *Report and Order* in Docket 21284, 71 F.C.C.2d 632, 792 (1979).

*United Community, supra*, FCC 79–781 (p. 12 n.13), 75 F.C.C.2d at 458 n.13.