### VALUEVISION INTERNATIONAL, INC., Petitioner,

v.

### FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

### Center for Media Education, et al., Intervenors.

### Nos. 97–1138, 97–1178.

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1998.

Decided July 24, 1998.

William R. Richardson, Jr. argued the cause for petitioner ValueVision International, Inc. With him on the briefs was Jonathan J. Frankel. J. Roger Wollenberg entered an appearance.

Peter Tannenwald argued the cause and filed the briefs for petitioner Community Broadcasters Association.

Joel Marcus, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were Christopher J. Wright, General Counsel, and Daniel M. Armstrong, Associate General Counsel. Robert J. Wiggers and Robert B.

Nicholson, Attorney, U.S. Department of Justice, entered appearances.

Daniel L. Brenner, Neal M. Goldberg and Diane B. Burstein were on the brief for intervenor National Cable Television Association, Inc.

Angela J. Campbell, Andrew J. Schwartzman and Gigi B. Sohn were on the briefs for intervenors Center for Media Education, et al.

Before: RANDOLPH, ROGERS, and TATEL, Circuit Judges.

RANDOLPH, Circuit Judge:

These consolidated petitions for review challenge portions of a Federal Communications Commission rule setting rates, terms and conditions for the carriage of "leased access" programming on cable systems.

Our opinion in *Time Warner Entertainment Co. v. FCC*, 93 F.3d 957, 967–69 (D.C.Cir.1996), describes the subject of leased access as follows: "In response to *FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), the [Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Act")] compelled cable operators of systems with more than thirty-six channels to set aside between 10 and 15 percent of their channels for commercial use by persons unaffiliated with the operator. 47 U.S.C. § 532(b)(1). The larger the number of channels in the system, the greater the percentage of channels the operator must set aside.[1] 'Leased access' was originally aimed at bringing about 'the widest possible diversity of information sources' for cable subscribers. *Id.* § 532(a). Congress thought cable operators might deny access to programmers if the operators disapproved the programmer's

social or political viewpoint, or if the programmers' offerings competed with those the operators were providing. 'Diversity,' as the 1984 Act used the term, referred not to the substantive content of the program on a leased access channel, but to the entities—the 'sources'—responsible for making it available. *See* H.R. REP. No. 934, [98th Cong., 2d Sess. 48 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4685]."

"The 1984 Act gave cable operators the authority to establish the price, terms, and conditions of the service on their leased access channels." 1984 Act, § 2, 98 Stat. at 2783 (original version of 47 U.S.C. § 532(c)(1)). With respect to those channels, then, the operator stood in the position of a common carrier. *See Midwest Video*, 440 U.S. at 701, 99 S.Ct. 1435; *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992: Indecent Programming and Other Types of Materials on Cable Access Channels*, 8 F.C.C.R. 998, 1001–02 ¶ 22 (1993) (first report and order). If an operator refused to provide service, persons aggrieved had the right either to bring an action in district court or to petition the Commission for relief. 47 U.S.C. § 532(d)–(e). The operator's rates, terms, and conditions were presumed reasonable, a presumption that could be overcome 'by clear and convincing evidence to the contrary.' *Id.* § 532(f). The operator was free to use any of the channels set aside for leased access until someone signed up. *Id.* § 532(b)(4).

The 1984 legislation did not accomplish much. Unaffiliated programming on leased access channels rarely appeared. *See* Donna M. Lampert, *Cable Television: Does Leased Access Mean Least Access?*, 44 FED. COMM. L.J. 245, 266–67 & n.122 (1992). Exactly

---

1. Subject to the rates, terms, and conditions established by the FCC pursuant to 47 U.S.C. § 532(c)(4), cable operators must set aside capacity for leased access as follows:

   (A) An operator of any cable system with 36 or more (but not more than 54) activated channels shall designate 10 percent of such channels which are not otherwise required for use (or the use of which is not prohibited) by Federal law or regulation.

   (B) An operator of any cable system with 55 or more (but not more than 100) activated channels shall designate 15 percent of such channels which are not otherwise required for use

(or the use of which is not prohibited) by Federal law or regulation.

   (C) An operator of any cable system with more than 100 activated channels shall designate 15 percent of all such channels.

   (D) An operator of any cable system with fewer than 36 activated channels shall not be required to designate channel capacity for commercial use by persons unaffiliated with the operator, unless the cable system is required to provide such channel capacity under the terms of a franchise in effect on October 30, 1984.

   47 U.S.C. § 532(b)(1).

why is uncertain. Cable operators said the reasons were high production costs and low demand in the face of the already wide array of programming operators were already providing. Others laid the blame at the feet of the operators, claiming they had set unreasonable terms for leased access. The FCC, in a 1990 report, recommended amending the 1984 Act to provide a national framework of leased access rules and to streamline the section's enforcement mechanism. *Competition, Rate Deregulation, and the Comm'ns Policies Relating to the Provision of Cable Television Serv.*, 5 F.C.C.R. 4962, 5048–50 ¶¶ 177–83 (1990) (report). The House Energy and Commerce Committee thought that cable operators had financial incentives to refuse access to those who would compete with existing programs. H.R. REP. No. 628, 102nd Cong., 2d Sess. 39–40 (1992). The Senate Commerce, Science, and Transportation Committee concurred, observing that the interests of cable operators and leased access programmers were almost certain to clash.[2] This Senate committee believed that the 1984 Act's leased access scheme suffered from 'fundamental problems' and that the Act's permitting operators to establish the rates and terms of leased access service made 'little sense.' S. REP. No. 92, [102nd Cong., 2d Sess. 30–32, *reprinted in* 1992 U.S.C.C.A.N. 1133, 1163–65].

"Amendments enacted in 1992 authorized the FCC to establish a maximum price for leased access, to regulate terms and conditions, and to establish procedures for the expedited resolution of disputes. 47 U.S.C. § 532(c)(4)(A). At the same time, Congress added a second rationale for leased access: 'to promote competition in the delivery of diverse sources of video programming.' *Id.* § 532(a), as amended."

Congress gave the Commission 180 days within which to establish rates. *See id.* § 532(c)(4)(B). The Commission met the deadline, but cautioned that its rate formula was only a "starting point that will need refinement...." *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation—Report and Order and Further Notice of Proposed Rulemaking* ("*Initial Rate Order*"), 8 F.C.C.R. 5631, 5936 (1993). The initial leased access rate rested on what the Commission called the "implicit fee" paid by non-leased access programmers to cable operators. *See id.* For non-leased channels, cable operators pay to acquire programming, then offer that programming to subscribers for a monthly service charge. The difference between the price cable operators pay programmers and the price subscribers pay for service is the "implicit fee" programmers pay to cable operators for carriage on the operator's system. *See id.* at 5950. Cable operators act as the "middlemen" between programmers and consumers. They recover costs of carrying the programming and generate their profit off the "markup" charged to subscribers. The Commission concluded that a fair leased access rate should compensate the operator for the "implicit fee" it would have earned had it not been required to lease the channel.[3] Recognizing that the implicit fee varies from channel to channel, the Commission set the rate cap for leased access at the highest implicit fee for a channel within the same category carried on a particular cable system. *Id.* at 5951.

2. The House Committee mentioned a study indicating that "there are 68 nationally delivered cable video networks, 39 of which, or 57 percent, have some ownership affiliation with the operating side of the cable industry." H.R. REP. No. 628, *supra*, at 41.

3. The Commission set out the method by which the implicit fee should be calculated. First, the Commission separated programmers seeking to lease commercial access channels into three categories: those planning to charge subscribers directly on a per event or per channel basis to view their programming; those proposing to use the channel for more than 50% of their lease time to sell products directly to customers (such as home shopping networks and infomercials); and all others. The Commission required cable operators to identify the programmers it carried on its non-leased access channels that fell within each of these three categories. The implicit fee was then determined through a two step calculation. The operator subtracted the monthly per subscriber rate it paid the programmer from the rate per month that a subscriber paid to receive the program. This number was then multiplied by the percentage of subscribers that were able to receive that channel or programming. The result was the implicit fee per subscriber for use of the channel. For each of the three types of programming, the highest of these fees was the maximum monthly leased access rate per subscriber that the operator could charge. *See id.* at 5949–50.

Petitions for reconsideration challenged the "highest implicit fee" formula. Cable operators and leased access programmers agreed that the Commission's rate had not stimulated the use of leased access, but differed about the reasons why. *See Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Leased Commercial Access—Order on Reconsideration of the First Report and Order and Further Notice of Proposed Rulemaking ("Reconsideration Order")*, 11 F.C.C.R. 16933, 16937 (1996). The Commission agreed to reopen the issue, but was careful not to guarantee a reduction in rates, stating that "as long as the maximum leased access rate is reasonable, we believe that minimal use of leased access channels would not indicate that the rate should be lowered." *Id.* at 16944. However, the Commission "tentatively" concluded that the highest implicit fee formula might overcompensate cable operators. *Id.* at 16937. It proposed replacing the implicit fee-based rate with a cost-based rate formula that it hoped would cure deficiencies in the highest implicit fee formula, and thus "better promote the goals of leased access." *Id.* Under the cost-based approach, cable operators that had not filled their quota of leased access channels could charge no more than "reasonable costs," which would include a reasonable profit. *Id.* at 16960. Although the Commission hoped the new formula would promote leased access, it warned that the "purpose of the cost formula is not, however, to lower leased access rates." *Id.* at 16938.

After considering comments filed by cable operators and programmers, the Commission issued an order rejecting the cost-based formula in favor of an implicit fee-based rate. *See Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Leased Commercial Access—Second Report and Order and Second Order on Reconsideration of the First Report and Order ("Final Rate Order")*, 12 F.C.C.R. 5267 (1997). The Commission explained that its cost-based rate proposal was flawed because it "does not account for negative effects that leased access programming might have on subscriber revenue (*i.e.*, lost subscriber revenue caused by subscribers dropping the tier or by requiring a lower price due to a devaluation of the tier)." *Id.* at 5279.

Rather than reinstating its original highest implicit fee formula, the Commission reduced the rate to the "average implicit fee," which is essentially the average amount full-time programmers implicitly "pay" the cable operator for carriage. *See id.* at 5283. The Commission also made a number of changes to the terms and conditions of leased access favoring leased access programmers. Such programmers were given the right to demand access to a tier with more than 50 percent subscriber penetration, *see id.* at 5290, thus preventing operators from relegating leased access to the least watched tiers. The Commission rejected the cable operators' challenge to a rule requiring operators to lease time in half-hour increments, *see id.* at 5298, and required operators to pro-rate the full-time rate for part-time use. *See id.* at 5302. The Commission also allowed leased access programmers to resell part of their time to other unaffiliated programmers. *See id.* at 5305.

Petitioner Community Broadcasters Association is a trade association for low-power television broadcast stations. Petitioner ValueVision International, Inc., is engaged in the business of producing television home shopping programs for distribution over cable systems. Their challenges to the Commission's *Final Rate Order*, although framed in different ways, boil down to a contention that the Commission showed too much concern for the financial health of cable operators and too little concern for the ability of programmers to afford leased access.

Intervenors Center for Media Education, Alliance for Community Media, Association of Independent Video and Filmmakers, Consumer Federation of America, United States Catholic Conference, and People for the American Way (hereinafter referred to as "Media Education") jointly filed a brief supporting petitioners. We address their claims separately only where they differ from petitioners'.

# I

Section 532(a) sets out the competing goals of the 1992 Act: "The purpose of this section

is to promote competition in the delivery of diverse sources of video programming and to assure that the widest possible diversity of information sources are made available to the public from cable systems in a manner consistent with growth and development of cable systems." 47 U.S.C. § 532(a). In setting rates for leased access, the Commission was to "assure that [cable channel leasing] will not adversely affect the operation, financial condition, or market development of the cable system." *Id.* § 532(c)(1).

The Commission reads the statute to require "balancing the interests of leased access programmers with those of cable operators." *Final Rate Order*, 12 F.C.C.R. at 5278. In the Commission's view, diversity is to be encouraged, but only in ways that do not impose adverse financial effects on cable operators, because "Congress did not intend that cable operators subsidize leased access programmers." *Id.* at 5279. The Commission therefore designed rates to compensate cable operators fully for lost operational and opportunity costs resulting from the displacement of operator-selected channels with leased access programming.

This interpretation, Community Broadcasters tells us, is contrary to the clear language of the statute and in any event is unreasonable because it fails to achieve the statute's "primary objective" of promoting diversity in programming. The objective of ensuring that cable systems will not be adversely affected financially was, according to this petitioner, merely a "caveat" designed to prevent the "destruction" of the cable industry. The Commission therefore should not have given equal weight to the interests of cable operators.[4]

■ The statutory language permits the Commission's construction. The Act instructs the Commission to set rates sufficient to *"assure* that [leased access] will not *adversely affect* the operation, financial condition, or market development of the cable system." 47 U.S.C. § 532(c)(1) (emphasis added). This provision serves as more than a mere "caveat" to the ultimate goals of

promoting leased access. The rates, terms and conditions of leased access must be set within its limits. The Commission's choice of the average implicit fee formula was a reasonable means of accomplishing the statute's purposes.

Media Education thinks § 532 embodies three goals—promoting leased access, protecting the cable industry, *and* assuring that the public has access to diverse sources of programming. According to Media Education, the Commission erred by considering only the first two in setting a maximum rate for leased access. We do not see how Media Education's interpretation of § 532 alters the outcome. The Commission was faced with reconciling the statute's purposes of promoting diversity through leased access without financially burdening cable operators. To the extent that its rate cap makes leased access more affordable, the public arguably will benefit from the resulting "diversity of information sources." 47 U.S.C. § 532(a). But the public's interest in diversity does not outweigh the statute's mandate that leased access rates not "adversely affect" cable operators, any more than promoting leased access programming does.

The legislative history also supports the Commission's interpretation. True, Congress hoped that granting ratemaking authority to the Commission would promote competition in the programming market and increase the diversity of programming sources. But Congress never intended to ensure financial success for leased access programmers. In fact, the Senate Report frankly acknowledged that leased access might not be economically viable. Outside of leased access, cable operators pay for the programs they select, offsetting the high costs of production borne by programmers. Yet under even the most generous formula, leased access programmers would be required to pay some fee to operators for access. Cable operators informed the Senate during oversight hearings that most programmers simply cannot afford to pay for

<hr/>

4. We do not consider Community Broadcasters' argument that the Commission erred in focusing on economic harm to cable channels, when it should have limited its analysis to economic harm to the cable system. No party raised this distinction before the Commission, and the Commission never addressed it. Under 47 U.S.C. § 405(a), the question is therefore not properly before us.

access. The Senate Report conceded that the "cable industry has a sound argument in claiming that the economics of leased access are not conducive to its use." S. Rep. No. 102–92, at 31 (1991).

## II

In its 1990 Report to Congress, the Commission identified the underutilization of leased access as a problem Congress should address, and Congress responded by transferring the obligation to set leased access rates from cable operators to the Commission. In implementing the 1992 Act, the Commission stated that its only obligation was to set a reasonable rate cap, regardless of its effect on demand for leased access. *See Final Rate Order,* 12 F.C.C.R. at 5278–79. The Commission erred, according to both petitioners, by focusing on the financial condition of the cable operators rather than the financial capabilities of leased access programmers. They rely on *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), for the proposition that the Commission's "fail[ure] to consider an important aspect of the problem" that it had previously recognized— namely, whether its rates created a viable market for leasing cable channels—was arbitrary and capricious.

■ The trouble with petitioners' argument is in its premise. It is not accurate to say that the Commission ignored the fact that its chosen rate formula might not increase use of leased access. The Commission did no such thing. It recognized this possible consequence, but thought it did not justify requiring cable operators to subsidize leased access programmers. When an agency considers a particular factor and rationally concludes that it should not affect its decision, the agency is not acting arbitrarily. It is exercising the judgment Congress entrusted to it.

■ The Commission did not completely disregard the 1992 Act's goal of promoting leased access, as petitioners suppose. Many of the changes to its initial rulemaking were designed to improve conditions for leased access. It reduced the rate from the highest implicit fee to the average implicit fee in an attempt to bring leased access within programmers' reach. *See Final Rate Order,* 12 F.C.C.R. at 5282. It altered the terms of leased access to benefit programmers by permitting part-time leases, resale of leased access slots, and by requiring cable operators to place leased access channels on tiers with 50 percent subscriber penetration. *See id.* at 5298, 5305, 5308. Community Broadcasters and ValueVision dismiss these changes in the terms and conditions of leased access as unhelpful to those who cannot afford the rates. Yet they cannot deny that the Commission's rulemaking included a number of changes favorable to leased access programmers. These changes belie petitioners' contention that the Commission ignored the interests of leased access programmers.

ValueVision argues that the Commission's average implicit fee formula suffers from the same flaws as the previous highest implicit fee rate—flaws that motivated the Commission to engage in a new round of notice and comment rulemaking. The *Final Rate Order* cannot stand, ValueVision continues, because the Commission failed to give "reasoned analysis" for its return to the very rate formula that it had earlier rejected.

In the first place, it is worth noting that the Commission never "rejected" its original implicit fee approach. The concerns it articulated in its *Reconsideration Order* were only "tentative." *Reconsideration Order,* 11 F.C.C.R. at 16937. The Commission solicited additional comments precisely because it was unsure whether its doubts were justified, and whether the cost-based approach would solve old problems or merely create new ones.

■ In the second place, the Commission did furnish a "reasoned analysis" for its reaffirmation of the implicit fee approach. In its *Final Rate Order,* the Commission explained that it was returning to an implicit fee formula because the concerns it had raised in its *Reconsideration Order* had proven unfounded. The Commission had worried that the implicit fee approach resulted in "double recovery" for cable operators, who were paid once in the form of subscriber fees and then again by leased access programmers. *See Reconsideration Order,* 11 F.C.C.R. at 16937. But after considering numerous comments

submitted by operators and programmers, the Commission concluded that its "double recovery" hypothesis was based on the erroneous assumption that operators would be able to charge subscribers the same amount for leased access programming that they charge for other programming on the same tier. *See Final Rate Order,* 12 F.C.C.R. at 5289. This was unlikely, the Commission realized, because subscribers could find leased access programming less attractive than the programming selected by the cable operator, reducing not only the fee the operator could charge for that channel, but also the fee it could charge for an entire tier of channels in which the leased access channel was placed.[5] *See id.* at 5286–87. When cable operators choose their programming, they may take into account the programs they currently offer, tailoring their selections to appeal to current subscribers and to attract new subscribers. Cable operators have no such control over leased access programming. Although the Commission acknowledged the possibility that *some* leased access programming will be attractive to subscribers, it concluded that on average leased access programming is less desirable to customers than the programming offered by the operator. *See id.* at 5287–89. Because subscribers might place no value on leased access programming, the lease fee is the only payment the operator receives, and therefore the operator does not "double recover" for those channels.

Even if a leased access channel generates subscriber revenue, the Commission recognized that it may not be enough to offset the lost revenues from the channel it displaced. Leased access programming can be less valuable to operators for reasons aside from its lack of desirability to subscribers. In accepting a leased access channel, the cable operator may lose advertising revenues because leased access programmers generally do not provide advertising slots to the cable operator. *See id.* at 5289. And leased access programming creates additional administrative costs. *See id.* For all of these reasons, the Commission concluded that the implicit fee formula would not result in a double

recovery for cable operators as it had originally feared, but would merely compensate the operator for the potential decrease in overall system value resulting from the replacement of the operator-selected channels with leased access channels.

In its *Reconsideration Order,* the Commission expressed concern that the highest implicit fee overcompensated operators, who were willing to accept a lower fee for some of their programming. *See Reconsideration Order,* 11 F.C.C.R. at 16937. The Commission explained in the *Final Rate Order* that its decision to replace the highest implicit fee with the average implicit fee "mitigates" this problem. *Final Rate Order,* 12 F.C.C.R. at 5290. ValueVision is not satisfied. The average implicit fee still overcompensates operators, ValueVision believes, because operators will bump the channels with the lowest implicit fee if forced to make room for leased access channels, thereby earning a better return off the leased access channels. But as the Commission explained, it is impossible to calculate a particular program's implicit fee with certainty because viewers purchase most channels in multi-channel tiers. *See id.* at 5289–90. Operators know what they pay for each channel, but they cannot be sure of the value of any single channel to subscribers. *See id.* Indeed, some subscribers may place little to no value on a channel that others highly value. Moreover, the implicit fee bears no relation to the popularity of a particular channel, and therefore no relation to the value of that channel to the operator. For example, it can be assumed that subscribers are willing to pay dearly for very popular channels, but those channels also cost operators the most to purchase, and therefore will often have very low implicit fees. The lowest implicit fee may actually be negative, and therefore is unsuitable as the rate-base for leased access. The Commission concluded that the average implicit fee is the most suitable basis from which to calculate leased access rates, since it would not regularly over- or undercompensate cable operators for bumping operator-selected channels for leased access programming. *See id.*

---

5. ValueVision's comments to the Commission reveal that it also recognized the possibility of subscriber loss, although it thought the problem

less significant than did the Commission. *See id.* at 5287.

Finally, the Commission concluded that it had been wrong to think its cost-based formula would more accurately reflect the costs of leased access. The Commission realized that the cost-based rate did not account for the fact that leased access programming could diminish the value of the entire tier on which it was placed. Operators deserved to recover lost subscriber fees resulting from leased access. The implicit fee was therefore a more accurate measure of the true costs of leased access. *See id.* at 5290. Although the average implicit fee is not a perfect measure of the costs of leased access programming, it falls well within the "zone of reasonableness" required to survive judicial review. *Nader v. FCC,* 520 F.2d 182, 192 (D.C.Cir.1975) (citing *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)).

### III

ValueVision complains that the Commission refused to give "any real consideration" to its market-based explicit fee proposal. ValueVision wanted the Commission to base its fees on the rates paid by an unusual class of non-leased cable channels where the programmers pay operators a certain amount per subscriber, just as leased access programmers do. According to ValueVision, this "real world" explicit fee approach provides a better estimate of the amount cable operators should be compensated for carrying leased access programming.

■ As the Commission explained in its *Final Rate Order,* ValueVision's "explicit fee" approach was one of many flat rate proposals. *Final Rate Order,* 12 F.C.C.R. at 5294. ValueVision proposed a rate of 10 cents per subscriber per month. Other suggested flat rates ranged from a penny to 90 cents. Presented with a wide array of estimated "real world" rates—and no method of choosing among them—the Commission explained that it was rejecting them all for failure to provide "sufficient empirical evidence demonstrating how their proposed flat rate would promote the statutory objectives...." *Id.* We find this explanation to be sufficient.

### IV

Community Broadcasters invokes § 604 of the Regulatory Enforcement Act, 5 U.S.C. § 604 (as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996), and § 257 of the Communications Act of 1934, 47 U.S.C. § 257(a), as additional reasons why the Commission improperly failed to consider the interests of leased access programmers. The Regulatory Flexibility Act provides that an agency shall accompany the promulgation of new rules with a "final regulatory flexibility analysis" assessing the negative impact of the rules on small businesses. 5 U.S.C. § 604. The Communications Act requires the Commission to promote diversity of media voices and to identify and eliminate barriers to market entry for small businesses in telecommunications. *See* 47 U.S.C. § 257(a) & (b). Although the Commission performed the analysis required by these statutes, Community Broadcasters nevertheless alleges that the Commission's analysis was insufficient because it focused on the effect the rules would have on those cable operators qualifying as small businesses and because it did not give adequate consideration to the negative impact of the rules on leased access programmers, most of whom are also small businesses.

The Commission argues that 47 U.S.C. § 405(a) bars Community Broadcasters from raising issues regarding the Regulatory Flexibility Act on appeal because it failed to argue this point below. Under § 405(a), a party must file a petition for reconsideration before the Commission unless the Commission has had an "opportunity to pass" on the issue. Although the Commission issued an Initial Regulatory Flexibility Analysis in its *Reconsideration Order,* and then sought written comments, Community Broadcasters never complained that the Commission's analysis had granted too much attention to small cable operators and too little to small leased access programmers. Arguably, however, the fact that the Commission addressed the effect of its rules on small leased access programmers in its Final Regulatory Flexibility Analysis preserves the question whether its discussion was sufficient.

In any event, we find that the Commission fulfilled its obligations under the Regulatory Flexibility Act. Understandably, the Commission's primary focus was on the small cable operators, who were directly subject to the new rule. *See Final Rate Order,* 12 F.C.C.R. at 5337–45. But the Commission did not fail to consider the impact of the rules on cable programmers. It concluded that the revised rules would have only a "positive" effect on programmers because they lowered the maximum rates for leased access service, permitted resale, granted access to highly penetrated tiers, and required part-time rates to be pro-rated. *See id.* at 5345. This analysis is sufficient to satisfy the obligations of the Regulatory Flexibility Act.

Nor do we find that the Commission erred in its market entry analysis. As § 257 of the Communications Act requires, the Commission analyzed barriers to market entry for entrepreneurs and other small businesses in telecommunications created by its new rules. *See* 12 F.C.C.R. at 5336. The Commission stated that it had established rates, terms and conditions for leased access intended to promote diversity and competition. *See id.* It noted that its "provisions for part-time leased access are especially suited to allow small or entrepreneurial leased access programmers to enter the telecommunications programming marketplace." *Id.* That Community Broadcasters disagrees with this analysis does not mean that the Commission failed to meet its obligations to examine and discuss the issue.

## V

Media Education challenges the Commission's decision not to grant preferential rates for nonprofit programmers. Leased access is intended for "commercial use," which the Communications Act defines as including both for-profit and not-for-profit video programming. 47 U.S.C. § 532(b)(5). The Commission viewed this provision as an indication that Congress intended nonprofit users to compete on equal footing for leased access. *See Final Rate Order,* 12 F.C.C.R. at 5313. In addition, the Commission noted that mandatory preferential treatment for nonprofit programmers would not necessarily promote diversity since there is no reason to think nonprofits are "inherently more diverse

than unaffiliated for-profit programming sources." *Id.* The Commission was also concerned that a preference might "adversely affect the operation, financial condition, or market development of the cable system" in contradiction to the statute's mandate. *Id.* at 5313–14. We find the Commission's interpretation of the statute to be reasonable, and conclude that the statute's purpose of promoting diversity did not require such a mandatory preference.

*The petitions for judicial review are denied.*