# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 14, 2012　　　　Decided January 15, 2013

No. 04-1033

ECHOSTAR SATELLITE L.L.C.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION,
INTERVENOR

Consolidated with 04-1109

On Petitions for Review of Orders of
the Federal Communications Commission

　　*Pantelis Michalopoulos* argued the cause for petitioner. With him on the briefs were *Stephanie A. Roy* and *Andrew W. Guhr*.

　　*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were *Catherine G. O'Sullivan* and *James J. Fredricks*, Attorneys, U.S. Department of Justice, *Austin C.*

*Schlick*, General Counsel, Federal Communication Commission, *Peter Karanjia*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, *Daniel M. Armstrong III*, Associate General Counsel*, and *John A. Rogovin* entered appearances.

*Paul Glist* and *Neal M. Goldberg* were on the brief for intervenor National Cable & Telecommunications Association in support of respondent. *Loretta P. Polk* entered an appearance.

Before: BROWN, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Circuit Judge* Brown.

Concurring opinion filed by *Senior Judge* Edwards.

BROWN, *Circuit Judge*: In an industry marked by constant innovation and year-to-year change, the dispute over the regulations in this case has lasted a full decade. DISH Network L.L.C. ("DISH"), [1] is a direct broadcast satellite provider. DISH challenges two orders of the Federal Communications Commission because they impose "encoding rules," which limit the means of encoding that cable and satellite service providers may employ to prevent unauthorized access to their broadcasts. We conclude the FCC lacked statutory authority to impose these rules and grant DISH's petitions for review.

I

---

[1] DISH formerly did business as EchoStar Satellite L.L.C.

Multichannel video programming distributors ("MVPDs") — a category that includes both cable and satellite television service providers — commonly offer access to their content through navigation devices, such as converter boxes. *See* 47 C.F.R. § 76.1200(a)–(c). Traditionally, cable television subscribers leased their navigation devices directly from their cable providers. *See Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 727 (D.C. Cir. 2000). But Congress, anxious to create separate markets for navigation devices and cable television services, added § 629 to the Communications Act as part of the Telecommunications Act of 1996. *See id.* That provision attempts to strike a balance: On the one hand, § 629 directs the FCC to "adopt regulations to assure the commercial availability" of "equipment used by consumers to access [MVP] services . . . from [independent] manufacturers, retailers, and other vendors." 47 U.S.C. § 549(a). At the same time, the regulations must not "jeopardize security of multichannel video programming . . . or impede the legal rights of a provider of such services to prevent theft of service." *Id.* § 549(b). Achieving this dual mandate demands technical standardization among MVPDs so that navigation devices can be marketed nationally while still proving capable of thwarting unauthorized access to service.

In 2002, with FCC prompting, cable television service providers negotiated with representatives of the consumer electronics industry to arrive at uniform standards that would allow compatibility across all cable systems. In particular, the FCC sought standards enabling "plug and play," which would allow consumers to connect digital television receivers directly to their cable systems, thus circumventing the need for an external navigation device. The negotiations resulted in a memorandum of understanding ("MOU") — a set of joint recommendations to the FCC — including rules prescribing what distributors could encode within their programming

streams, and banning "selectable output control," which allows distributors and content providers to remotely shut off a connector or output on a program-by-program basis (e.g., preventing a subscriber from recording a certain television program). The agreement was contingent on application of the encoding rules to all MVPDs, not just cable television service providers.

The FCC issued a notice of proposed rulemaking in January 2003 soliciting comment on the MOU's proposed rules. During the comment period, various satellite carriers criticized the proposed application of the encoding rules to all MVPDs. They both complained that satellite carriers were excluded from the negotiations that gave rise to the MOU and also characterized imposition of the encoding rules on all MVPDs as a *quid pro quo* for cable service providers' acquiescence to plug-and-play standards. The FCC nevertheless adopted the proposed rules with only minor changes in *Implementation of Section 304 of the Telecommunications Act of 1996, Second Report and Order*, 18 FCC Rcd. 20885 (2003) ("Order"). As the MOU recommended, the Order's encoding rules barred selectable output control. The adopted encoding rules also addressed two related issues: prohibiting down-resolution of broadcast programming — which involves streaming content at an intentionally degraded resolution quality — and limiting the level of copy protection encoding applicable to certain categories of programming. In the FCC's view, applying the encoding rules only to the cable industry "would create a permanent competitive imbalance," whereas "[u]niform application of the proposed encoding caps serves the dual function of providing a competitive baseline for MVPDs while ensuring that consumers have equal access to content regardless of their service provider." Order ¶ 71, 18 FCC Rcd. at 20916. Reaffirming its "stated goal . . . to strike a measured

balance between the rights of content owners and the home viewing expectations of consumers, while ensuring competitive parity among MVPDs," the FCC later revised the encoding rules to clarify their application to encrypted and unencrypted broadcast programming. *See Implementation of Section 304 of the Telecommunications Act of 1996, Order on Reconsideration*, 18 FCC Rcd. 27059, 27059–60 (2003) ("Reconsideration Order").

DISH now petitions for review of the Order and the Reconsideration Order.

## II

DISH argues the FCC's decision to apply the encoding rules to all MVPDs exceeded the agency's statutory authority. Because we agree the FCC lacked the power to impose the encoding rules on all MVPDs, we need not reach DISH's alternate contention that the decision was arbitrary and capricious. But first we must satisfy ourselves of our jurisdiction to review DISH's challenge.

## A

As a threshold matter, the FCC insists § 405 of the Communications Act bars review of DISH's claim that the agency was without authority to apply encoding rules to all MVPDs. Section 405 bars judicial review of questions upon which the Commission, or its designated authority, has been afforded no opportunity to pass unless a party first files a petition for reconsideration. 47 U.S.C. § 405(a). The question, then, is whether the FCC had an opportunity to consider DISH's challenge to its authority to promulgate the encoding rules.

Because § 405 is phrased in the passive voice, whether the FCC "has been afforded [an] opportunity to pass" on an argument does not depend on whether DISH raised it. *See Time Warner Entm't Co., L.P. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998). Absolute precision is unnecessary; judicial review is permitted so long as "the issue is necessarily implicated by the argument made to the Commission." *Id.* at 80.

The Order's discussion of the FCC's authority satisfies us that § 405's requirements have been met. *See* Order ¶¶ 45–47, 55–57, 18 FCC Rcd. at 20905–10. In justifying the encoding rules, the FCC invoked both explicit and ancillary authority under § 629 of the Communications Act, as well as ancillary authority under § 624A of the Act, which covers "[c]onsumer electronics equipment compatibility." 47 U.S.C. § 544a. This was no cursory reference; the FCC devoted several pages of the Order to discussing the statutory basis of its authority to promulgate encoding rules regulating all MVPDs. Even if no other party brought the matter to the agency's attention, the FCC's independent contemplation of the issue satisfies § 405's mandate. *See DIRECTV, Inc. v. FCC*, 110 F.3d 816, 825 (D.C. Cir. 1997). We thus proceed to the merits of DISH's claim.

B

The FCC cites three sources for its authority: § 629's mandate that the FCC "adopt regulations to assure the commercial availability . . . of converter boxes, interactive communications equipment, and other equipment used by consumers to access multichannel video programming," 47 U.S.C. § 549(a); authority ancillary to § 629; and authority ancillary to § 624A, which permits the FCC "to restrict cable systems in the manner in which they encrypt or scramble signals" to assure "compatibility between televisions and video

cassette recorders and cable systems," 47 U.S.C. § 544a(b). None is availing.

Section 629 provides no direct authority for the encoding rules, but deference to the FCC's view of § 629's meaning is appropriate so long as "Congress has not directly addressed the precise question at issue" and the FCC's interpretation is "reasonable." *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843–44 (1984). [2]  Here, the FCC's reading founders on *Chevron*'s second step: though § 629's directive to "adopt regulations to assure the commercial availability" of navigation devices may afford the FCC some wiggle room in crafting its regulatory regime, the statute's language is not as capacious as the agency suggests.

Certainly, § 629 provides no explicit textual basis for the encoding rules, instead authorizing "regulations to assure the commercial availability" of navigation devices. 47 U.S.C. § 549(a).  But the FCC points out the encoding rules fulfill "consumers' expectations that their digital televisions and other equipment will work to their full capabilities." Order ¶ 60, 18 FCC Rcd. at 20911; *see also id.* ¶ 64, 18 FCC Rcd. at 20913 (invoking the same argument to support restriction of down-resolution); *id.* ¶ 68, 18 FCC Rcd. at 20915 (doing the same with respect to copy protection limits).  Consumer satisfaction enhances consumer demand, ensuring a viable commercial market.  However, as the FCC acknowledges, the encoding rules are not necessary to sustain a commercial market for direct broadcast satellite devices.  In fact, the FCC

---

[2] Whether application of *Chevron* in this context is sensible is an entirely different matter.  *See AKM LLC dba Volks Constructors v. Sec'y of Labor*, 675 F.3d 752, 766 (D.C. Cir. 2012) (Brown, J., concurring).  The Supreme Court recently granted *certiorari* to address this issue.  *See City of Arlington, Tex. v. FCC*, 133 S. Ct. 524 (Oct. 5, 2012) (mem.).

concluded "differences in the marketplace for [direct broadcast satellite] equipment, where devices are available at retail and offer consumers a choice, as compared to equipment for other MVPD services, particularly cable operators, [justified] not applying" other § 629 rules to satellite service providers. *Implementation of Section 304 of the Telecommunications Act of 1996, Report and Order*, 13 FCC Rcd. 14775, 14800 (1998). And, as the Order itself recognizes, satellite equipment is "already available at retail" and "portable nationwide." Order ¶ 46, 18 FCC Rcd. at 20905. Applying the encoding rules to cable providers may meet consumer expectations with respect to the market for cable devices, but that is no reason to impose these rules on all MVPDs.

As an alternative justification, the FCC also reasoned that the encoding rules "are an essential component of the MOU," and that the MOU "will assure the commercial availability of navigation devices." *Id.* ¶ 47, 18 FCC Rcd. at 20906. But this cannot be enough to tether the encoding rules to § 629. The FCC cannot simply impose any regulation stipulated in an MOU as a means of promoting the commercial availability of navigation devices, no matter how tenuous its actual connection to § 629's mandate. To read § 629 in this way would leave the FCC's regulatory power unbridled — so long as the agency claimed to be working to make navigation devices commercially available. Nor does the FCC adhere to the view that rigid imposition of the encoding rules is essential to making navigation devices commercially available. Otherwise, it would not have permitted partial waiver, at the behest of the Motion Picture Association of America, of the ban on selectable output control. *See Motion Picture Association of America, Petition for Expedited Special Relief; Petition for Waiver of the Commission's Prohibition on the Use of Selectable Output Control (47 C.F.R. § 76.1903), Memorandum Opinion and Order*, 25 FCC Rcd. 4799 (2010).

We next turn to the FCC's assertion of its ancillary jurisdiction under both § 629 and § 624A, which, under certain circumstances, extends the agency's regulatory powers beyond express statutory mandates. Under § 4(i) of the Communications Act of 1934, the FCC is authorized to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions," 47 U.S.C. § 154(i); *see United States v. Sw. Cable Co.*, 392 U.S. 157, 178 (1968); *United States v. Midwest Video Corp.* ("*Midwest Video I*"), 406 U.S. 649, 669–70 (1972) (plurality opinion); *FCC v. Midwest Video Corp.* ("*Midwest Video II*"), 440 U.S. 689, 708–09 (1979). We have summarized the doctrine in a two-part test: the FCC may invoke its ancillary jurisdiction only when "(1) the Commission's general jurisdictional grant under Title I [of the Communications Act] covers the regulated subject and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 691–92 (D.C. Cir. 2005). Neither side disputes that the encoding rules, through their application to cable and satellite broadcasts, qualify as regulations of "radio and wire communication service" under Title I. At issue instead is whether the encoding rules were reasonably ancillary to the FCC's effective execution of its duties under either § 629 or § 624A.[3]

---

[3] We note that the FCC's interpretation of the reach of its ancillary jurisdiction is owed no deference, since *Chevron* only applies in instances in which Congress has delegated an agency authority to regulate the area at issue. *See United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Since we conclude Congress did not empower the FCC to apply the encoding rules to all MVPDs, deferring to the FCC's own assertion of its authority on this point would beg the question. *See Am. Library Ass'n*, 406 F.3d at 699.

The FCC contends the encoding rules are reasonably ancillary to its mission of assuring the commercial availability of navigation devices because they removed one of the "stumbling blocks" to the consumer electronics industry's production of such equipment for retail: the "inability of industry to agree on a comprehensive set of technical copy protection measures and corresponding encoding rules" that would "ensure the availability of high value content to consumers in a protected digital environment."  Order ¶ 55, 18 FCC Rcd. at 20909.  Yet by this standard, there is little the FCC could not regulate in the name of fulfilling § 629's mandate.  Could cable providers have stipulated that their adoption of the MOU was premised on FCC restrictions on satellite providers' content offerings?  Could they have demanded the FCC limit the number of channels satellite providers might broadcast in high definition?  Under the FCC's view, its ancillary jurisdiction is effectively plenary. The FCC is not authorized under § 629 to take any action that lessens the competitive pressures posed by satellite providers in order to induce cable operators to ratify an MOU the agency favors.  Guided by the principle that ancillary jurisdiction is not "unrestrained authority," *Midwest Video II*, 440 U.S. at 706, we refuse to interpret ancillary authority as a proxy for omnibus powers limited only by the FCC's creativity in linking its regulatory actions to the goal of commercial availability of navigation devices.  *See also Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well."). The FCC's ancillary jurisdiction may be broad, but it is not unbounded.

The encoding rules fare no better under § 624A. Unlike § 629, § 624A actually discusses encoding of the sort addressed by the Order. *See* 47 U.S.C. § 544a(a)(1). But whereas § 629 applies to all MVPDs, § 624A's reach is limited by its plain language to cable systems, directing the FCC to adopt regulations "as are necessary to assure . . . compatibility" between cable systems on the one hand and televisions and video cassette recorders on the other.[4] 47 U.S.C. § 544a(b)(1). By invoking its ancillary authority in conjunction with § 624A's compatibility mandate, the FCC seeks to square this circle.

The FCC is powerless to wield its ancillary jurisdiction, however, where "there are strong indications that agency flexibility was to be sharply delimited." *Midwest Video II*, 440 U.S. at 708. Section 624A's textual delegation of authority to regulate cable systems, as opposed to all MVPDs, is precisely such an indication. True, application of the *expressio unius est exclusio alterius* canon[5] is not robotic. But its use is appropriate when "one can be confident that a normal draftsman when he expressed 'the one thing' would have likely considered the alternatives that are arguably precluded." *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998). Here, there is every reason to believe § 624A was directed at cable systems alone. The provision was enacted as part of the Cable Television Consumer Protection and Competition Act of 1992

---

[4] We set aside for now whether § 624A's reference to "video cassette recorders," now a largely antiquated technology, is adequate to sustain the FCC's purported interest in the ability of consumers to retain "the full benefits of . . . the functionality" of their recording devices. Order ¶ 56, 18 FCC Rcd. at 20910.

[5] "A canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." BLACK'S LAW DICTIONARY 661 (9th ed. 2009).

("Cable Act"), which also amended the Communications Act to include the term "multichannel video programming distributor," defining it to include "direct broadcast satellite service." Pub. L. No. 102-385, sec. 2(c)(6), § 602(c)(12), 106 Stat. 1460, 1463 (codified as amended at 47 U.S.C. § 522(c)(13)). In fact, one of the Cable Act's stated goals was "to increase the availability of satellite cable programming and satellite broadcast programming." Cable Act, sec. 19, § 628, 106 Stat. at 1494 (codified at 47 U.S.C. § 547). Clearly, Congress was adept at using the terms "satellite" and "multichannel video programming distributor" when it so chose. In contrast to cable television technology in *Southwestern Cable*, satellite television was not some new phenomenon Congress had no opportunity to contemplate when enacting § 624A. *See* 392 U.S. at 172–73. It is one thing for the FCC to invoke its ancillary authority in furtherance of express congressional directives. But it is quite another when the FCC invokes its ancillary jurisdiction to override Congress's clearly expressed will.

Nor is the position espoused by the National Cable and Telecommunications Association ("NCTA"), acting as intervenor, persuasive. The NCTA adopts a more circumspect view of the FCC's authority, acknowledging the obvious implausibility of interpreting § 629 as empowering the FCC to take any action it deems useful in its quest to make navigation devices commercially available. Instead, the NCTA suggests that § 629 sweeps all MVPDs, not just cable providers, under the ambit of § 624A: "If Section 629 means anything, it means that the Commission now has authority to apply to *all MVPDs* the same encoding rules that both DISH and the Commission agree the Commission could independently impose on *cable operators* under Section 624A." The NCTA's theory of the interplay between the two statutes is novel — perhaps because it ignores § 629(f), which

cautions, "Nothing in this section shall be construed as expanding or limiting any authority that the Commission may have under law in effect before" enactment of the Telecommunications Act of 1996. 47 U.S.C. § 549(f). The NCTA interprets § 629 to mean the exact opposite.

In the end, we are left with two provisions, neither of which authorizes the encoding rules at issue. Section 629's text provides no direct authority for the encoding rules, and the FCC's arguments in favor of such an interpretation are unconvincing. Section 624A addresses encoding, but only in the context of cable systems. The FCC's application of encoding rules to all MVPDs was therefore *ultra vires*.

## III

Because the FCC denies that the challenged orders could operate absent the encoding rules — indeed, its argument is premised on this very notion — the encoding rules are not severable. *See MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) ("Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision."). In granting DISH's petitions for review, we therefore vacate the Order and Reconsideration Order in their entirety.

## IV

For the foregoing reasons, the petitions for review are

*Granted.*

EDWARDS, *Senior Circuit Judge*, concurring: I agree with the majority that the Federal Communications Commission ("FCC" or "Commission") has neither direct nor ancillary authority under Section 624A of the Communications Act, 47 U.S.C. § 544a, nor ancillary authority under Section 629(a) of the Act, 47 U.S.C. § 549(a), to impose the disputed "encoding rules" on satellite carriers. The Commission's positions on these points cannot survive scrutiny under *Chevron* Step One or Step Two. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984). As the majority opinion makes clear, the claims advanced by the FCC are entitled to no deference because they are "manifestly contrary to the statute." *Id.* at 844.

I do not read the majority opinion to say that the FCC has *no authority* under Section 629 to impose encoding rules on satellite carriers, however. This court certainly cannot say that Congress' direction to the FCC to ensure the commercial availability of navigation devices may never be reasonably interpreted to support the application of encoding rules on satellite carriers. We simply do not know this. Congress obviously afforded the FCC considerable discretion in directing the agency to promulgate standards "to assure the commercial availability . . . of converter boxes, interactive communications equipment, and other equipment used by consumers to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailers, and other vendors not affiliated with any multichannel video programming distributor." 47 U.S.C. §549(a). The statute does not by its terms prohibit the requirement of encoding rules. Rather, any challenge to the agency's exercise of its discretion under Section 629 must take into account the circumstances presented and the Commission's explanation for the action in question.

Petitioner readily concedes that "the plug-and-play standards" adopted by the FCC "may be deemed within the scope of Section 629." Pet'r Br. at 20. Petitioner's concern is

that "the nature of the encoding rules as a *quid pro quo* to get a private party to agree to these standards is not a sufficient nexus to Section 629." *Id. Nexus*, however, is not necessarily a matter of authority; rather, it concerns a connection, bond, or link between different things. I agree that, *in this case*, the FCC has failed to show the necessary link between the imposition of encoding rules on satellite carriers and the mandate of Section 629. Therefore, the agency's decision fails for want of reasoned decisionmaking, not for lack of authority. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that, to survive arbitrary and capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"); *see also Judulang v. Holder*, 132 S. Ct. 476, 483-85 & n.7 (2011) (holding that an irrational application of a statute is arbitrary and capricious).

In some circumstances, there is an overlap in the analysis required pursuant to *Chevron* Step Two, 467 U.S. at 843-45, and that required under the arbitrary and capricious standard enunciated in *State Farm*, 463 U.S. at 42-44. *See, e.g.*, *Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995); *see also id*. at 620 (Wald, J., concurring in the judgment) ("Because both standards require the reviewing court to ask whether the agency has considered all of the factors made relevant by the statute, this court has often found the *State Farm* line of cases relevant to a *Chevron* step two analysis."). Nonetheless, absent plain meaning in the authorizing statute, a court should be loathe to preemptively declare that an agency has *no authority* to apply a certain operating standard when it is impossible to know whether the disputed standard might be permissible under different circumstances. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 985 (2005) (holding that, "[b]efore a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must

hold that the statute unambiguously requires the court's construction"). On this record, the court cannot possibly know whether or to what extent the FCC might permissibly impose encoding rules on satellite carriers pursuant to Section 629.

Petitioner has pressed the point that, *in the circumstances at hand*, the Commission's application of the encoding rules to *all* Multichannel Video Programming Distributors ("MVPD") is arbitrary and capricious. *See* Pet'r Br. at 40-48. Indeed, Petitioner convincingly shows that the FCC adopted the disputed encoding rules here to serve the interests of the cable industry and consumer electronics manufacturers in almost total disregard of the interests of satellite carriers.

> The FCC acknowledged the *fait accompli* nature of the [disputed] rules: "[a]bsent adoption of these encoding rules, the cable and consumer electronics industries have indicated that the compromise agreement reached in the [Memorandum of Understanding Among Cable MSOs and Consumer Electronics Manufacturers ("MOU")] will be upset and their efforts to produce unidirectional digital cable products will falter." *Plug and Play Order*, 18 FCC Rcd. at 20906 ¶ 47. The very speed with which the FCC placed the MOU and its rules on public notice (22 days) foreshadowed the FCC's acquiescence. The FCC appears to have taken little time to independently review and consider the proposal based on statutory objectives. The FCC did not propose any independent revisions to the proposed rules, and instead simply issued the MOU-proposed rules as its own proposal. The *Plug and Play Order* went on to adopt the encoding rules in their entirety, and apply them to all MVPD providers for one principal reason – lest the MOU fall apart and leave the FCC with unfulfilled directives under Sections 624A and 629.

> This reasoning is of suspect validity at best. First, the FCC did not have its hands tied; it could promulgate its own

> set of rules – a better set of rules that considers the positions of all MVPD providers. Second, the threat of defection from a private agreement should not carry weight in an agency's deliberation. The FCC acts pursuant to statutory authority and objectives, and the FCC's reasoning that its directive would be frustrated were the MOU to falter is reasoning that is far too attenuated.

Pet'r Br. at 42-43.

Much of what Petitioner says is on the mark and unrefuted by the FCC. However, I reject Petitioner's suggestion that FCC rulemaking may never take into account the threat of defection from a private agreement. This argument overreaches. The telling point *in this case* is that the FCC relied on a threat of defection that was tied to a condition – requiring satellite carriers to adopt encoding rules – that was patently unreasonable. Apart from the threat of defection, the FCC failed to explain how requiring satellite carriers to adopt encoding rules was necessary to assure the commercial availability of converter boxes and other equipment pursuant to Section 629.

In sum, it is clear that the action taken by the FCC pursuant to its asserted authority under Section 629 was the antithesis of reasoned decisionmaking and, thus, arbitrary and capacious. In my view, there is no *Chevron* issue to be decided by this court. *See Judulang*, 132 S. Ct. at 483 n.7. On this record, the imposition of the disputed encoding rules on satellite carriers fails for lack of reasoned decisionmaking.